803 A.2d 721

STATE OF NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–APPELLANT, v. K.F., DEFENDANT–RESPONDENT, AND C.W. AND B.M., DEFENDANTS.

R.G. AND G.G., INTERVENORS–RESPONDENTS.

IN THE MATTER OF THE GUARDIANSHIP
OF A.F. AND C.F. MINORS.

Superior Court of New Jersey
Appellate Division

Argued August 6, 2002—Decided August 13, 2002.

624

Before Judges NEWMAN, BRAITHWAITE and FALL.

*Michael Anthony Amantia* argued the cause for appellant (*David Samson*, Attorney General of New Jersey, attorney; *Michael J. Haas*, Assistant Attorney General, of counsel, *Mr. Amantia*, Deputy Attorney General on the brief).

*Douglas A. Cole*, argued the cause for defendant-respondent.

*Louis H. Miller*, argued the cause for intervenors-respondents.

*Harold J. Bush* argued the cause for minors.

The opinion of the court was delivered by

NEWMAN, J.A.D.

New Jersey Division of Youth and Family Services (DYFS), appeals from an order entered by Judge Marilyn Rhyne Herr terminating DYFS's involvement in this action and requiring it to send the minor children, C.F. and A.F., to live with their maternal grandparents in Pennsylvania without Pennsylvania's approval of that placement. DYFS argues that the order must be reversed because it does not comply with the requirements of the provisions of the Interstate Compact on the Placement of Children, *N.J.S.A.* 9:23–5, (ICPC); namely, that the receiving state issue its approval prior to such placement. We disagree and hold that the ICPC

does not apply to relative placement and, therefore, it does not require the prior approval of the receiving state when a court in this state has decided against foster care in favor of placing children with their out-of-state maternal grandparents.

The facts as found by the trial court are not contested. C.F. was born on October 31, 1997, and A.F. was born on July 24, 2000. K.F. is the mother of both children. C.W. is the father of C.F., and B.M. is the father of A.F. Intervenors R.G., the step-grandfather, and G.G. are the maternal grandparents of the minor children.

In October of 2000, A.F. required hospitalization at Hunterdon Medical Center for breathing problems. K.F., who was living with her parents, argued with them and left their house with C.F. and A.F. She did so, however, without A.F.'s asthma medications. K.F. brought A.F. to Hunterdon Medical Center. Hospital personnel, DYFS caseworker Mildred Alvarez and her supervisor reviewed their "concerns" about K.F.'s care of her children. They described her as "overwhelmed" and reported her as stating that, "her mother would kick her out" for signing a voluntary placement agreement for the children.

Although K.F. withdrew her consent to such placement, A.F. was released from the hospital on December 12, 2000, to a foster home. The maternal grandmother called the DYFS supervisor and expressed her anger over the children's placement in foster care. On December 4, 2000, at the recommendation of Alvarez, the maternal grandparents filed for custody of C.F. and A.F. On December 13, 2000, DYFS filed a verified complaint for custody. The court entered a show cause order on December 14, 2000, which granted immediate custody of both C.F. and A.F. to DYFS and scheduled the return date for January 11, 2001.

On the return date the trial court entered an order that continued custody with DYFS, granted weekly supervised visits at DYFS' offices, ordered psychological evaluations for K.F. and the maternal grandparents and ordered parenting skills classes. The court also ordered K.F. and R.G. to undergo drug treatment

services. The maternal grandparents appeared with K.F. on the return day of the show cause order and on every court date thereafter.

At the request of DYFS, Michael J. Fiore, Ph.D. conducted a psychological assessment of K.F. and the maternal grandparents. He submitted a report dated February 15, 2001, concluding that although the maternal grandparents would require counseling, they were appropriate caretakers for their grandchildren.

By the time of the February 22, 2001 case management review hearing, the maternal grandparents were receiving family counseling with K.F. At that hearing, DYFS agreed to unsupervised visitation and submitted a report to the court dated February 15, 2001, stating that K.F. and the maternal grandparents had "been compliant with all of the Division's recommendations. They've attended all visits with the children, and have met all scheduled appointments with service providers." One such service provider was Judith Kail, a family therapist with Catholic Charities in Flemington.

Kail began working with K.F. and the maternal grandparents in February 2001. In a report dated April 25, 2001, Kail detailed the family's progress and recommended that the children be placed with their maternal grandparents. K.F. and the maternal grandparents continued to treat with Kail until DYFS terminated therapy on August 1, 2001. Kail recommenced treatment with the family in October 2001, when the court ordered therapy to resume. In a report dated December 6, 2001, signed only by Kail, she described the maternal grandparents as "willing and invested participants" and recommended placement of the children with them.

Kail gave a draft of this report to her supervisor who had recommended grammatical corrections. Kail made the corrections, signed and dated the report December 6, 2001, and sent a copy to the maternal grandparents. Kail also sent a copy to the DYFS caseworker because a court permanency hearing was scheduled for December 13, 2001. The attorney for the maternal

grandparents ascertained that DYFS altered the December 6, 2001 Kail report before that hearing.

The court conducted a plenary hearing and determined that DYFS did in fact alter the December 6, 2001 Kail report. Sharon McCobin, the Director of the Hunterdon County DYFS office, had received a copy of the Kail report and requested that it be altered. McCobin directed Kail to omit from her report any reference to the grandparents gaining custody of the children and to omit "all" of her recommendations. Kail revised the report without changing the date, signed it and, after her supervisor signed the report, forwarded it to the court and all attorneys. Kail testified at the plenary hearing that she continued to hold the opinions expressed in her original report. Later, on March 6, 2002, Kail advised the court that she "was released from [her] duties at Catholic Charities...."

At the conclusion of the plenary hearing, the attorney for the maternal grandparents moved to dismiss the DYFS action and to allow the maternal grandparents to proceed under their custody complaint. K.F.'s attorney joined in that application as did the law guardian. The trial court did not immediately terminate the involvement of the Hunterdon County DYFS office. Instead, the court implemented the recommendations of Kail. The court ordered increased visitation between the maternal grandparents and their grandchildren and further ordered that "all communications by any persons connected with the case, with counselors, except the patient, shall be in writing with copies to all other counsel." DYFS did not comply with that order.

On January 7, 2002, Patrick Shannon, a DYFS therapy supervisor, reported that he had conducted five recent sessions with the maternal grandparents and the children. The court had instructed DYFS to ask Shannon to perform his therapeutic supervision services in the maternal grandparents' home because he lived near them in Pennsylvania. Despite the court's order that all communications be in writing, DYFS advised the court that it had contacted Shannon and that he was ill and would be taking a leave

from his practice for several months. DYFS did not find a replacement for Shannon's therapeutic supervision until March 10, 2002, when Karen Spence, LSW, from the Children's Home Society began her visits. On April 9, 2002, Spence reported that she found no basis to deny placement of the children with their maternal grandparents.

The case management review order entered by the court on February 22, 2001 required an assessment of the maternal grandparents' Pennsylvania residence. Initially, K.F. lived with the maternal grandparents in a house they rented in Milford, New Jersey. Sometime prior to the February 22, 2001 case management review hearing the maternal grandparents moved to a larger home in Bath, Pennsylvania owned by the maternal great-grandmother. According to the trial judge, the Pennsylvania home assessment was necessitated by the allegation of DYFS that the maternal grandparents' New Jersey home was "cramped, cluttered and dirty."

DYFS did not assess the Pennsylvania home. Rather, on February 27, 2001, DYFS sent Pennsylvania an Interstate Compact Placement Request, a "court order" and "other enclosures," which DYFS did not provide to the trial court. The trial judge found that Northampton County Children, Youth & Families (NCCYF) relied on those enclosures to conclude that the children would be at risk if placed with their maternal grandparents even though the residence met all of Pennsylvania standards.

Two subsequent requests of a home study by NCCYF resulted in the same recommendation. In a letter dated December 12, 2001, NCCYF set forth three reasons to support the agency's refusal to recommend Interstate Compact placement of the children with their maternal grandparents in Pennsylvania. The trial court determined that those reasons were based upon historical data supplied by the Hunterdon County DYFS office and not upon objective and current observations of NCCYF. Despite a court order, no one appeared on behalf of NCCYF to testify as to the

condition of the maternal grandparents' home or as to the conclusions reached in its reports.

On April 11, 2002, the trial court terminated the involvement of DYFS in this action and concluded that the court would proceed with a hearing on the maternal grandparents' custody application. In doing so, the trial court determined that the objective reports prepared by Kail, Shannon and Spence supported the conclusion that foster parent adoption was not the appropriate goal for the family. The court acknowledged that the maternal grandparents and children had resided within the State of New Jersey at the commencement of this action and had consented to the trial court's continuing jurisdiction. In terminating the involvement of DYFS, the judge had this to say:

> [W]hatever problems the people in Pennsylvania raised, they are simply from this Court's perspective, regurgitations of what they've been told by the Hunterdon County DYFS office, which has evidenced a shocking lack of objectivity in this case, and the shocking manipulation of professionals in this case.

In a written decision, the trial judge elaborated on the manipulations of DYFS, stating:

> The comments on the record on April 11, 2002, do not adequately set forth the very troublesome obstruction and interference by the Hunterdon office of the Division of Youth & Family Services with this court's obligation to render a decision on placement of these children on the merits. . . .
>
> . . . .
>
> As a result of the disturbing evidence of interference with the independence of therapist Kail by her supervisor at the clear behest of District Office Director Sharon McCobin, this court took the unusual step on April 11, 2002, of terminating the FN [abuse or neglect] case. All the recent objective reports support the conclusion that foster parent adoption is not the appropriate goal for this family. While family support is needed, it can't be continued by any agency that has a hidden agenda. It is more properly accomplished through the public school programs and the [maternal grandparents'] own medical and mental health providers. Thus, the court felt compelled to terminate the involvement of DYFS in this matter and to hold a hearing in this Court on the [maternal grandparents'] request for custody filed on December 4, 2000 under an FD [non-dissolution matter] Docket.

On appeal, DYFS contends that the ICPC governs the subject matter of this case. Because the Pennsylvania authorities did not

consent to the placement, DYFS asserts that the trial court's actions are nugatory.

The goal of the ICPC is to facilitate placements that "serve the best interests of the children, whether interstate or intrastate." B.W. Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption,* 68 Neb. L.Rev. 292, 297 (1989). To that end, the ICPC was developed to maximize the opportunities for the placement and monitoring of dependent children by removing the limitations imposed by state boundaries, increasing the flow of information between cooperating states and providing guidelines for resolving jurisdictional conflicts. *Ibid.* New Jersey and Pennsylvania have both signed the ICPC and enacted statutes codifying its provisions. *See N.J.S.A.* 9:23–5; *Pa. Stat. Ann.* §§ 761 to 765.

Article II defines "placement" as "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution but does not include any institution caring for the mentally ill, mentally defective or epileptic or any institution primarily educational in character, and any hospital or other medical facility." *N.J.S.A.* 9:23–5, art. II, subd. (d).

Article III of the ICPC provides "Conditions for Placement," including the following: "No sending agency shall send, bring, or [] cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein." *N.J.S.A.* 9:23–5, art. III, subd. (a).

Additionally, that article requires the sending agency to "furnish the appropriate public authorities in the receiving state written notice of the intention to send, bring, or place the child in the receiving state," *N.J.S.A.* 9:23–5, art. III, subd. (b), and mandates that the child shall not be sent into the receiving state "until the appropriate public authorities in the receiving state shall notify

the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." *N.J.S.A.*, art. III, subd. (d).

Article V of the ICPC requires the sending agency to retain jurisdiction over the child "until the child is adopted, reaches majority, becomes self-supporting, or is discharged with the concurrence of the appropriate authority in the receiving state." The sending agency "shall continue to have financial responsibility for support and maintenance of the child during the period of the placement." *N.J.S.A.* 9:23–5, art. V, subd. (a). Article V also provides that "[w]hen the sending agency is a public agency, it may enter into an agreement with an authorized public or private agency in the receiving state providing for the performance of one or more services in respect of that case by the latter as agent for the sending agency." *N.J.S.A.* 9:23–5, art. V, subd. (b).

Article VIII sets forth limitations to the strictures of the ICPC. That article specifies that the ICPC shall not apply to "[t]he sending or bringing of a child into a receiving state by his[or her] parent, step-parent, grandparent, adult brother or sister, adult uncle or aunt, or his [or her] guardian and leaving the child with any such relative or non-agency guardian in the receiving state." *N.J.S.A.* 9:23–5, art VIII, subd. (a). Other provisions of the ICPC deal with penalties, delinquent children, construction and severability.

In light of the definition of "placement" and the limitations of Article VIII, the issue here is whether the ICPC applies when a court in this state directs that children be placed with members of their natural family in another participating state. The Third Circuit considered the applicability of the ICPC and the limitations of Article VIII in the context of out-of-state parent placement in *McComb v. Wambaugh*, 934 *F*.2d 474 (3d Cir.1991).

In *McComb* the Third Circuit examined the history of interstate compacts, the interrelationship between compacts and state statutes, the purpose and legislative history of the ICPC, and the regulations promulgated by the Association of Administrators of

the Interstate Compact on the Placement of Children. *Id.* at 479–482.

In reviewing the text of the Compact, the Third Circuit focused on Articles II, III, V and VIII. *Id.* at 480–481. The court noted that while Article II defined placement of a child as the arrangement for the care of a child in a family, it did not define the term "family." *Id.* at 480. Relying on the language of Article III, the Third Circuit described the definition of "placement" as limiting the ICPC's application "to substitutes for parental care such as foster care or arrangements preliminary to adoption." *Ibid.* The Third Circuit noted that the Association of Administrators of the Compact had adopted regulations that defined "placement" to include a situation in which a court as the sending agency arranges for a parent in another state to care for a child. *Id.* at 481. Addressing this dichotomy, the Third Circuit held that *the regulation must yield to the statutory language. Ibid.* The court determined that the regulation did not bear on the question of whether the ICPC's definition of placement includes placement of a child with his or her natural parent. *Ibid.*

The Third Circuit found support for its definition of placement in Article V of the ICPC, which provides for the retention of jurisdiction over the child by the sending state. *Id.* at 480. The court reasoned that construing the return of a child to his or her natural parent as a placement would lead to the anomalous result that a sending state's duty to support children would supersede the traditional duty of natural parents to support their children. *Ibid.*

The Third Circuit also relied on Article VIII of the ICPC to bolster its holding that the return of a child to his or her natural parent is not a "placement" within the terms of the ICPC. As stated above, Article VIII excludes placement of a child by certain natural family members with a "relative or non-agency guardian." *N.J.S.A.* 9:23–5, art. VIII, subd. (a). Quoting the draftsman's notes for the ICPC, the Third Circuit concluded that this exclusion "exempted certain close relatives . . . in order to protect the social

and legal rights of the family because it was recognized that regulation is desirable only in the absence of adequate family control." *McComb, supra,* 934 *F.*2d at 481 (citing *Draftsman's Notes on Interstate Compact on the Placement of Children,* reprinted in R. Hunt, *Obstacles to Interstate Adoption,* 44 (1972)). According to the court, Article VIII implied that the term "placement" referred to placement with a substitute for a child's natural family. *Ibid.* (finding that the interpretation of ICPC to govern only the placement of children in substitute arrangements for parental care "avoid[ed] entanglement with the natural rights of families [and] is consistent with the limited circumstances that justify a state's interference with family life").

The *McComb* court declined to apply the ICPC because the child at issue there had been placed with his natural family and not with a substitute family. The Third Circuit held that the ICPC did not govern a sending state's placement of children with their natural family in another state. *Id.* at 482.

Several state courts have also held the ICPC inapplicable to placement of children with out-of-state natural parents or relatives. *See, e.g., Ark. Dep't. of Human Servs. v. Huff,* 347 *Ark.* 553, 65 *S.W.*3d 880 (2002) (parent placement); *State, Dep't of Children & Family Servs. v. L.G.,* 801 *So.*2d 1047 (Fla.Dist.Ct.App.2001) (parent placement); *In re Interest of Eric O,* 9 *Neb.App.* 676, 617 *N.W.*2d 824 (2000) (grandparent placement); *In re Johnny S.,* 40 *Cal.App.*4th 969, 47 *Cal.Rptr.*2d 94 (1996) (parent placement); *Tara S. v. Superior Court,* 13 *Cal.App.*4th 1834, 17 *Cal.Rptr.*2d 315 (1993) (parent placement).

While other courts have applied the ICPC to out-of-state placements with natural family members, the conclusions of those courts were either summarily rendered or are contrary to the plain language of the ICPC. *See, e.g., In re T.N.H.,* 70 *S.W.*3d 2 (Mo.Ct.App.2002) (summarily applying ICPC) *Arizona Dep't of Economic Sec. v. Leonardo,* 200 *Ariz.* 74, 22 *P.*3d 513 (Ct.App. 2001) (applying regulations); *Adoption of Warren,* 44 *Mass.App. Ct.* 620, 693 *N.E.*2d 1021 (applying regulations), *review denied,* 427

*Mass.* 1107, 700 *N.E.*2d 268 (1998); *Matter of Tsapora Z.,* 195 *A.D.*2d 348, 600 *N.Y.S.*2d 224 (N.Y.App.Div.1993) (summarily applying ICPC).

■ Here, the relationship between DYFS and the children ended with the conclusion of the April 11, 2002 disposition hearing when the court terminated the involvement of DYFS and dismissed its case. At that time, the court ruled against foster home placement of the children and ordered that it would proceed with a hearing on the maternal grandparents' custody application. The children were returned to their grandparents who then resided in Pennsylvania. Article VIII(a) plainly states that the ICPC does not apply to the sending or bringing of a child into a receiving state by certain individuals including grandparents. Thus, the ICPC does not apply to this case. Consistent with the analysis of the Third Circuit, we hold that the ICPC does not apply to relative placement and, therefore, it does not require the prior approval of the receiving state when a court in this state has decided against foster care in favor of placing children with their out-of-state maternal grandparents.

This holding is congruent with the court's duty to enforce the will of the Legislature as expressed by the plain unambiguous language of the statute. *See MacMillan v. Director, Div. of Taxation,* 180 *N.J.Super.* 175, 177, 434 *A.*2d 620 (App.Div.1981) *aff'd o.b. per curiam,* 89 *N.J.* 216, 445 *A.*2d 397 (1982) (" '[c]onstruing' or 'interpreting' a clear and unambiguous statute is simply not permissible"). It also corresponds with the court's responsibility to avoid unreasonable or absurd results when interpreting and applying statutes consistent with the intent and purpose of the legislature. *State v. Gill,* 47 *N.J.* 441, 444, 221 *A.*2d 521 (1966).

The ICPC was intended to remove, not to create, obstacles to out-of-state placements that are in the best interests of children. It would be nonsensical to use the ICPC, as DYFS suggests, to prohibit a court's placement of children with their natural family solely because that family resides in another state. In this particular case, application of the ICPC would also defeat the

goals of the ICPC, sanction the efforts of the Hunterdon County DYFS office to avoid its responsibility to work toward relative placement and restrict the trial court's discretion to assess the maternal grandparents' ability to care for the minor children.

Even, however, if the ICPC was controlling, an affirmance of the trial court's decision is still required. DYFS manipulated evidence and obstructed the court's fact-finding process. DYFS does not dispute those findings but, instead, seeks a reversal of the trial court's order exclusively upon a technical application of the ICPC.

 To view the ICPC as a set of rigid rules would circumvent its goals and the court's ability to achieve those goals. The court's paramount duty in child welfare cases is to protect the best interest of the children. *In re Guardianship of K.H.O.*, 161 *N.J.* 337, 347, 736 *A.*2d 1246 (1999). The overall design of the ICPC is to facilitate placements that are in the best interest of the children. *N.J.S.A.* 9:23-5, art. I. It is the policy of DYFS to place, whenever possible, children with relatives when those children are removed from the custody of their parents. *In re E.M.B.*, 348 *N.J.Super.* 31, 34, 791 *A.*2d 256 (2002). To advance the goals of the ICPC and the policy of DYFS, the court must have a broad discretion to evaluate and assess a relative's ability to care for children. The unusual circumstances of this case buttress the reasons for leaving that assessment to the experience of the trial judge.

Here, the trial court's personal observations and the three objective reports favoring placement of the children with their maternal grandparents greatly outweighed the nonobjective report of NCCYF. The trial court determined that the receiving state prepared a home study based not upon objective and current data but· upon historical information supplied *ex parte* by the Hunterdon County DYFS office. The trial court concluded that that study was not objective and failed to account for the family's current abilities.

Additionally, the court found that DYFS exhibited "a shocking lack of objectivity ... and [a] shocking manipulation of professionals." The trial court also determined that DYFS pursued the goal of foster parent adoption for C.F. and A.F. instead of seeking reunification or relative placement. To that end, the Hunterdon County DYFS office required the alteration of Kail's report, interfered with the family's counseling and therapeutic visitation sessions and continued to have oral communications with counselors despite a court order for such communications to be in writing.

Moreover, the trial court had adequate information before ordering the placement. *Cf. Dep't of Children & Families v. Benway*, 745 *So.*2d 437, 439 (Fla.Dist.Ct.App.1999) (reversing placement where the trial court did not have any evidence of a parent's ability to care for a child prior to placing that child with an out-of-state parent); *In re Eli F.*, 212 *Cal.App.*3d 228, 260 *Cal.Rptr.* 453 (1989) (same). The court had before it the report of three social service therapists who observed, counseled and reported on the maternal grandparents' desire to have the children and the suitability of that placement. The court had the opportunity to question Kail at the plenary hearing. At that time, Kail testified that she continued to hold the opinion that the children should be placed with their maternal grandparents. Further, the court had an opportunity to observe the character and demeanor of the maternal grandparents who were present at all of the court hearings.

The trial court also did not relinquish jurisdiction over the minor children. *Cf. Dep't of Health & Rehab. Servs. v. J.M.L.*, 455 *So.*2d 571, 572 (Fla.Dist.Ct.App.1984) (reversing child placement with out-of-state grandparents where that placement was specifically disapproved by the out-of-state officials and where the trial judge's order relinquished jurisdiction over the minor children). In this case, the family resided in New Jersey at the time the maternal grandparents filed an application to obtain custody over the children, which application they made prior to the filing of the DYFS action. While the maternal grandparents moved to a

larger house in Pennsylvania, they attended all therapy and visitation sessions in New Jersey as well as all scheduled court hearings and, as the trial court found, they had consented to New Jersey's continuing jurisdiction over their application for custody of C.F. and A.F.

■ Regardless of Pennsylvania's refusal to approve of the placement, the trial court's determinations that the maternal grandparents were able and willing to assume custody of the children and that placement of the children with their maternal grandparents would not be detrimental and was in the best interests of the children are fully supported by the record.

The trial court's order is affirmed.