## IN RE YARISHA F.*
### (AC 31123)

DiPentima, Harper and Peters, Js.**

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued February 16—officially released May 11, 2010

*Tammy Nguyen-O'Dowd*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellant (petitioner).

*Robert J. Moore*, for the appellee (respondent).

*Gerald B. Gore*, for the appellee (intervening maternal grandmother).

*Valeria Caldwell-Gaines*, for the minor child.

*Opinion*

PETERS, J. Connecticut has enacted the Interstate Compact on the Placement of Children governing the placement of a minor child in a home in another state. General Statutes § 17a-175, article III, subsection (d) provides that "[t]he child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." In this case of first impression, the dispositive issue is whether § 17a-175 permits a trial court to order an out-of-state placement to a member of the minor child's extended family without the approval of the placement by an agency in the receiving state. Because we conclude that the trial court was required to comply with the unambiguous mandate of the statute, we reverse the judgment of the trial court directing the out-of-state placement of the child with her maternal great-grandmother.

On March 14, 2008, the commissioner of children and families (commissioner) filed a petition for the termination of parental rights of the respondent, the mother

of the minor child, Yarisha F.[1] Prior to adjudication of the petition, the child's maternal grandmother, a Florida resident, had become an intervenor in this matter. The intervenor moved that the child's maternal great-grand-mother, also a resident of Florida, be appointed as guardian for the child. The petition for termination of the respondent's parental rights and the motion to transfer guardianship were consolidated for trial, which was held in December, 2008. On May 1, 2009, the trial court, *Wilson, J.*, granted the motion to transfer guardianship to the great-grandmother, finding that she was a suitable and worthy caretaker for the child.[2] The court ordered that the guardianship and placement would become effective following (1) receipt of a pending interstate compact study of the great-grandmother's suitability and (2) six months of visitation between the great-grandmother and the child. In response to further motions, the court clarified its judgment to hold that, in light of the evidence before it, the transfer of guardianship would become effective upon receipt of the interstate compact study, even if that study contained a negative evaluation of the great-grandmother.

The commissioner has appealed from the court's initial judgment, challenging the legal and factual conclusions of the court and from the court's subsequent refusal to open the judgment, despite the receipt of a negative social study concerning the great-grandmother from Florida child welfare authorities.[3] We reverse the judgment of the court.[4]

---

[1] The child's mother is the sole respondent in this matter because the child's father is deceased.

[2] The court did not address the merits of the petition for termination of parental rights.

[3] The attorney for the minor child, in her brief and at oral argument before this court, supported the position of the commissioner.

[4] Because we reverse the judgment of the court on the first ground asserted by the commissioner, we need not reach the second ground argued for reversal, namely, that the court's findings of fact were clearly erroneous.

The following facts and procedural history are undisputed. In May, 2006, the commissioner took temporary custody of the minor child. On November 7, 2006, the court adjudicated the child to have been neglected and committed her to the care and custody of the commissioner. Although the maternal grandmother was permitted to intervene to present herself as a guardian and a possible placement for the child, a negative report on her suitability ruled out that possibility.[5] On June 3, 2008, the intervenor moved to transfer guardianship to the child's maternal great-grandmother.[6]

In May, 2009, the court granted the motion to transfer guardianship to the great-grandmother, effective upon receipt of the interstate compact study and six months of visitation between the child and the great-grandmother. The commissioner filed a motion to reargue, which the trial court granted for the purpose of clarifying its May, 2009 decision. In response to an order of this court, on September 9, 2009, the trial court issued an articulation, stating: "No further trial court proceedings must occur, nor is it necessary to wait for the pending [interstate compact study] on the [maternal great-grandmother] before transfer of guardianship can occur." The court further stated that it had independently determined that it was in the child's best interest

---

[5] The commissioner's permanency plan initially called for the intervenor to take custody of the child as her guardian. Accordingly, the commissioner requested that Florida complete a study of the intervenor and her home in Florida, a home that she shared with her mother, the child's great-grandmother. Florida approved this placement, but the intervenor subsequently failed a drug test taken at the request of the commissioner.

[6] In January, 2008, the commissioner requested that Florida determine the suitability of placing the child with her great-grandmother. At the time of the May 1, 2009 judgment, the results of the study had not yet been received by the court. The court concluded that "[u]nless there is a substantial change in . . . circumstances since the earlier favorable [interstate compact study] performed in July, 2007, which approved [great-grandmother's] residence as an appropriate placement for [the child], this court cannot envision that the pending [study] will be anything less than positive."

to be placed with the great-grandmother, regardless of the outcome of the study.

On October 7, 2009, the commissioner filed a motion to open the judgment and reopen evidence to present newly discovered evidence. The commissioner offered the results of the completed interstate compact study, which did not support placement with the great-grandmother, as well as a statement documenting the child's strong negative reaction to her August, 2009 visit with the great-grandmother. Although neither the respondent nor the intervenor filed an objection to the motion to open, and the child's attorney filed notice that she supported it, the court denied it on October 19, 2009. Ruling that the evidence was not newly discoverable because the commissioner could have presented rebuttal evidence against the transfer of guardianship at trial, the court denied the motion. The commissioner then amended her appeal to include a challenge to the court's denial of the motion to open.

I

The commissioner principally claims on appeal that, in light of § 17a-175, the court had no authority to transfer guardianship of the child to her great-grandmother in Florida without a supporting interstate compact study report from a suitable authority in that state.[7] In response, the respondent and the intervenor argue that the court retained the authority to make an independent assessment of the propriety of the proposed placement, especially because, in this case, an earlier Florida compact study had approved the suitability of a placement

---

[7] In its May 1, 2009 memorandum of decision, the court held that the transfer would be effectuated upon *completion* of the compact study. The court's June 16, 2009 memorandum of decision on the motion to reargue and the September 9, 2009 articulation, however, make it clear that the delay in transfer of guardianship did not depend on Florida's *approval* of the placement, and the decision to transfer guardianship would stand regardless of the outcome of the compact study.

with the intervenor, who at the time of the study had resided with the great-grandmother. We agree with the commissioner.

Our resolution of the commissioner's claim concerning the application of the Interstate Compact on the Placement of Children requires us to ascertain the meaning of § 17a-175 as applied to the facts of this case. "Such [i]ssues of statutory construction raise questions of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Cruz* v. *Montanez*, 294 Conn. 357, 367, 984 A.2d 705 (2009).

Connecticut adopted the Interstate Compact on the Placement of Children in 1967 and codified it as § 17a-175. All fifty states, the District of Columbia and the U.S. Virgin Islands have enacted the compact. See American Public Human Services Association, Guide to the Interstate Compact on the Placement of Children 3 (Rev. 2002), available at http://icpc.aphsa.org/Home/Doc/Guidebook_2002.pdf (last accessed April 22, 2010). Arti-

cle I of the compact provides in relevant part that "[i]t is the purpose and policy of the party states to cooperate with each other in the interstate placement of children to the end that . . . [e]ach child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree of care."

Article III of the compact defines the requirements for the placement of a child in a receiving state. Subsection (a) requires that "[n]o sending state shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein." Article III (d) further provides that a "child *shall not* be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." (Emphasis added.) The compact defines "sending agency" to include "a court of a party state"; General Statutes § 17a-175, article II (b); and defines a "receiving state" as "the state to which a child is sent, brought, or caused to be sent or brought, whether by public authorities or private persons or agencies, and whether for placement with state or local public authorities or for placement with private agencies or persons." General Statutes § 17a-175, article II (c).

Although Connecticut courts have rarely had an occasion to apply the compact, the majority of jurisdictions that have considered the issue have concluded that the compact prohibits courts from placing children out of

state prior to the appropriate notification under article III (d). See, e.g., *In re T.M.J.*, 878 A.2d 1200 (D.C. 2005); *Dept. of Children & Families* v. *Fellows*, 895 So. 2d 1181 (Fla. App. 2005); *In re Adoption of Infants H.*, 904 N.E.2d 203 (Ind. 2009); *In re Welfare of Child of: T.T.B. & G.W.*, 724 N.W.2d 300, 303 (Minn. 2006); *In the Matter of Miller*, 178 Or. App. 271, 36 P.3d 989 (2001); *In re Paula G.*, 672 A.2d 872 (R.I. 1996). This prohibition has been applied to intrafamily placements. *In re Ryan R.*, 29 App. Div. 3d 806, 815 N.Y.S.2d 221 (2006) (placement with aunt and uncle); *Dept. of Children & Families* v. *Fellows*, supra, 1181 (placement with aunt); *In re T.M.J.*, supra, 1201 (placement with grandmother); *In the Matter of Miller*, supra, 271 (placement with grandfather).[8]

## A

In its memorandum of decision denying the motion to reargue, the court, while noting the out-of-state authority to the contrary, relied on *Division of Youth & Family Services* v. *K.F.*, 353 N.J. Super. 623, 803 A.2d 721 (App. Div. 2002), for support of its decision to order the placement of the child prior to receiving a report from Florida. The Appellate Division of the New Jersey Superior Court upheld the trial court's placement of children with their grandparents, despite the trial court's receipt of a negative interstate compact study on the grandparents' Pennsylvania home. Id., 638. Relying on the analysis in *McComb* v. *Wambaugh*, 934 F.2d

---

[8] The states are split on whether placement with a natural parent is governed by the interstate compact. Courts in some states have determined that placement with a parent does not fall within the meaning of placement used in the compact. See, e.g., *Arkansas Dept. of Human Services* v. *Huff*, 347 Ark. 553, 563, 65 S.W.3d 880 (2002); *State* v. *L.G.*, 801 So. 2d 1047, 1050 (Fla. App. 2001). Other states have held that any out-of-state placement, even with a parent, is governed by the compact. See, e.g., *In re T.N.H.*, 70 S.W.3d 2, 9 (Mo. App. 2002). The court in the present case explicitly stated that it was not relying on the proposition that placement with a great-grandmother is not governed by the interstate compact; these cases, therefore, are not persuasive.

474 (3d Cir. 1991), the Appellate Division held that the trial court's order granting custody to the grandparents did not fall within the ambit of the interstate compact because "[a]rticle VIII (a) plainly states that the [interstate compact] does not apply to the sending or bringing of a child into a receiving state by certain individuals including grandparents." *Division of Youth & Family Services* v. *K.F.*, supra, 635.[9] The court in *Division of Youth & Family Services* concluded that even if the interstate compact were applicable, it would nonetheless affirm the trial court's decision because the trial court had sufficient evidence in support of placement with the grandparents. Id., 636.

The case of *Division of Youth & Family Services* is factually and procedurally distinct from the present case due to its unique facts, namely, that the New Jersey division of family and youth services had "manipulated evidence and obstructed the court's fact-finding process." Id. The division "required the alteration of [an independent therapist's] report, interfered with the family's counseling and therapeutic visitation sessions and continued to have oral communications with counselors despite a court order for such communications

---

[9] The court in *Division of Youth & Family Services* v. *K.F.*, supra, 353 N.J. Super. 634, and the trial court in the present case, mistakenly cite *In re Interest of Eric O.*, 9 Neb. App. 676, 617 N.W.2d 824 (2000), as having concluded that placement of children with grandparents falls outside of the interstate compact. The court in *In re Interest of Eric O.* relied on article VIII of the interstate compact and held that the compact does not apply to "[t]he sending or bringing of a child into a receiving state *by* his parent, stepparent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian," to conclude that the long-time guardians of the children at issue were allowed to move out of state without first complying with the interstate compact. (Emphasis added.) Id., 682. In *In re Interest of Eric O.*, the guardians had custody pursuant to an agreement with the natural father, and, therefore, no "sending agency" made the decision to move the children out of state. Id., 678; but cf. *In the Matter of Miller*, supra, 178 Or. App. 278–79 (holding that placement by court with grandparent, knowing that grandparent is moving out-of-state, requires compliance with interstate compact).

to be in writing." Id., 637. Procedurally, the trial court in *Division of Youth & Family Services* first terminated the involvement of the New Jersey child protection authorities before it transferred custody of the child to the grandparents. Id., 630. That case, therefore, does not support the trial court's judgment in the present case.

B

The intervenor argues, as an alternative basis for affirming the judgment, that the prior approval by the Florida child protection authorities of her as a placement while she lived with the great-grandmother authorized the court to place the child in that home.[10] This argument relies on article VIII (b) of the interstate compact, which exempts from its requirements "[a]ny placement, sending or bringing of a child into a receiving state pursuant to any other interstate compact to which both the state from which the child is sent or brought and the receiving state are party, or to any other agreement between said states which has the force of law."

The language cited by the intervenor deals with cases that are governed by other interstate compacts and makes the provisions of those other compacts controlling on the placement procedures. See, e.g., Interstate Compact for Juveniles, General Statutes § 46b-151h. Although the Interstate Compact on the Placement of Children also refers to "any other agreement . . . which has the force of law"; General Statutes § 17a-175, article VIII (b); no authority has been cited, and research has revealed none, for the proposition that an approval of one relative by an out-of-state agency becomes "an agreement . . . which has the force of

---

[10] We note that in the memorandum of decision on the motion to reargue, the court clarified that its decision to transfer guardianship to the great-grandmother did not rest on the previous approval of the intervenor. The court, therefore, implicitly rejected the argument raised by the intervenor.

law." General Statutes § 17a-175, article VIII (b). Indeed, the intervenor herself, as noted, was ultimately excluded as a placement option *despite* her approval from Florida. The intervenor's prior approval, therefore, cannot operate as an "agreement . . . with the force of law"; General Statutes § 17a-175, article VIII (b); on which the trial court could rely to place the child with her great-grandmother.

We also note that the approval of the intervenor as a placement occurred over one and one-half years before the trial in this matter. The great-grandmother testified to the effect that, over the same time period, various children and grandchildren moved in and out of her home. That fact alone would require an up-to-date study in order to ensure that no one currently in the home posed a risk to the child. In addition, the completed interstate compact study, and the report of the child following her visit, revealed substantial problems with the physical environment of the home, highlighting the importance of not relying on outdated information when making placement decisions. Furthermore, even if the condition of the home had not changed, the appropriateness of the placement decision must be based, at least in part, on the identity of the primary caretaker.

The intervenor also argues that the court complied with the requirements of the compact because its May 1, 2009 decision states that the transfer of guardianship and placement of the child would not be effectuated until completion of the compact study. This argument ignores the reality that the court decided to effectuate the transfer of guardianship without regard to whether Florida would approve the placement.

C

The respondent argues that the court had the authority to make its own findings of fact concerning the best

interest of the child and to make a placement without regard to the conclusion reached by the Florida authorities pursuant to article III (d) of the compact. She relies on three out-of-state cases that, in her view, stand for the proposition that a sending state can ignore its obligations under the compact if it finds that the best interest of the child is served by the placement. We are not persuaded.

Two of the cases cited by the respondent; *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 701 A.2d 110 (1997); *In re Adoption No. 10087*, 324 Md. 394, 597 A.2d 456 (1991); addressed violations of the interstate compact by prospective adoptive parents who personally took the children out of state before receiving approval by the interstate compact authorities of either state. In *In re Adoption No. 10087*, supra, 424, the Court of Appeals of Maryland, in overturning the trial court's dismissal of the adoption petition, remanded the case with instructions to achieve retroactive compliance with the interstate compact. The Court of Appeals also stated that the determination of whether adoption would be in the child's best interest should be paramount to the trial court. Id. In *In re Adoption/Guardianship No. 3598*, supra, 311, the Court of Appeals reinstated a trial court decision approving an adoption petition that had been reversed by the intermediate appellate authority because the adoptive parents had failed to comply with the approval requirement in the interstate compact. The court held that it did not "rule out the possibility of a trial court, under appropriate circumstances, dismissing an adoption petition as a violation the [interstate compact]. Certainly, the best interest of the child remains the overarching consideration and the needs of the child should not be subordinate to enforcement of the [interstate compact]." Id., 323.

Both cases involved independent adoptions, meaning that no state or private agency was involved with the

placement and are, thus, distinguishable from the present case where child protection authorities are involved. It is also notable that in *In re Adoption No. 10087*, no party challenged the propriety of the placement with the adoptive parents. Although the Maryland cases emphasize the importance of the best interest of the child in adoption petitions, neither case holds that a court, in the first instance, may order a child placed in an out-of-state home without complying with the interstate compact, as the trial court did in this case. Rather, the Maryland adoption cases reflect the unwillingness of the courts to disturb a completed placement, made several years prior to the court's ruling, that involved infants who were settled into the home of adoptive parents and raised in those homes since birth. These distinguishing factual and procedural histories do not persuade us to conclude, as the respondent suggests, that a court may make an independent determination of the child's best interest without regard to the mandates of the interstate compact.

A third case cited by the respondent; *Florida* v. *Thornton,* 183 W. Va. 513, 396 S.E.2d 475 (1990); does not support the respondent's position, as it involves the question of whether a state may maintain jurisdiction over a child after a violation of the compact. The violation in question involved the failure of the sending state to provide ongoing financial support for the child, and the court determined that despite that failure, the best interest of the child dictated that the sending state retain jurisdiction to consider the best placement option for the child. Id., 519.

In sum, none of the cases cited by the respondent support the proposition that a sending agency, in this case a court, may rely on an independent determination of the best interest of the child, to deliberately disregard the requirement of article III (d). We agree with the court in *In re Adoption of Infants H.,* supra, 904 N.E.2d

208, that "[t]he conditions for placement set forth in article III of the Compact are designed to provide complete and accurate information regarding children and potential adoptive parents from a sending state to a receiving state and to involve public authorities in the process in order to ensure children have the opportunity to be placed in a suitable environment." See also *In re T.M.J.*, supra, 878 A.2d 1203 ("[a]s the [interstate compact] dictates, [the receiving state's] refusal to approve placement of the child with [the maternal grandmother] barred the Superior Court from ordering that disposition"); *In re Luke L.*, 44 Cal. App. 4th 670, 681–83, 52 Cal. Rptr. 2d 53 (1996) (reversing juvenile court decision authorizing out-of-state placement for failure to receive approval from receiving state).

In the present case, the commissioner in January, 2008, requested that Florida complete an interstate compact study on the great-grandmother. At the time of the court's decision, the study had not been completed, and Florida had not given notice pursuant to article III (d). Even if the court was justifiably concerned about Florida's delay in processing the request for an interstate compact study,[11] the court's conclusion

---

[11] Although the nearly two year delay that occurred between the request for the study and actual receipt of the study, which occurred in September, 2009, was regrettable, we note that delays are not unusual in cases requiring interstate compact studies. "[S]erious concerns have been raised about the time it takes to complete the home study when placing children across state lines and the performance of state [interstate compact] offices, which oversee the process. Anecdotal evidence from child welfare professionals and [interstate compact] administrators alike has identified the time it takes to complete a home study and differing state law and policies as major concerns. In a 1999 study of [interstate compact] implementation conducted by the Office of the Inspector General, almost one-half of all respondents interviewed thought the process for obtaining a home study on an out-of-state resource is too lengthy . . . ." (Citation omitted.) American Public Human Services Association, Understanding Delays in the Interstate Home Study Process 2 (2002), available at http://icpc.aphsa.org/Home/Doc/resources/home_study_report.pdf (last accessed April 22, 2010).

that it could place the child in Florida without approval from the authorities there contravenes the directives of the statute. Accordingly, we hold that the court improperly transferred guardianship to the great-grandmother in Florida.

## II

The commissioner also challenges the denial of her motion to open the judgment. Because the judgment that the commissioner seeks to open is reversed, our conclusion in part I of this opinion has rendered it unnecessary to address this claim. A ruling by this court on the motion to open would provide no practical relief beyond that which is already provided in part I of this opinion.

The judgment is reversed and the case is remanded with direction to vacate the order transferring guardianship to the maternal great-grandmother and for further proceedings consistent with this opinion.

In this opinion the other judges concurred.