# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3592-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

H.B.,

      Defendant (deceased),

and

T.D.F., SR.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF P.X.F.,
a minor.

_____

      Argued March 11, 2025 – Decided April 2, 2025

      Before Judges Gilson, Firko, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0025-24.

Steven Edward Miklosey, Designated Counsel, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Steven Edward Miklosey, on the brief).

Nicholas Dolinsky, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Nicholas Dolinsky, on the brief).

Todd Wilson, Designated Counsel, argued the cause for minor (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith A. Pollock, Deputy Public Defender, of counsel; Todd Wilson, on the brief).

PER CURIAM

T.D.F., Sr. (Trent) appeals from the June 27, 2024 judgment terminating his parental rights to his minor son, P.X.F. (Preston), and granting the Division of Child Protection and Permanency (DCPP) guardianship of the child, with a plan that the child be adopted by his maternal grandparents.[1] Trent argues DCPP failed to satisfy the second part of prong three, alternatives to termination of parental rights. He further argues the placement of his minor son with his

---

[1] We use initials and pseudonyms, for ease of reference, to protect the confidentiality of the proceedings. See R. 1:38-3(d)(12).

maternal grandparents in Florida created a "barrier" between them. DCPP and the child's Law Guardian urge that we affirm the judgment and allow the adoption to proceed. Having reviewed the record in light of the parties' contentions and the applicable law, we affirm substantially for the reasons expressed in the comprehensive and well-reasoned oral opinion of Judge Francine I. Axelrad.

The facts and evidence were detailed in Judge Axelrad's oral opinion, which she rendered after a bench trial. A summary will suffice here. H.B. (Hanna) and Trent are the biological parents of Preston, born in September 2022.

Hanna had a history of mental health issues, hospitalization, domestic violence, homelessness, and substance abuse. When Hanna gave birth, she tested positive for phencyclidine (PCP),[2] cocaine, and marijuana. Preston, born five weeks premature, tested positive for cocaine and syphilis. He spent twelve days in the neonatal intensive care unit showing symptoms of withdrawal. DCPP executed an emergency removal and upon release from the hospital, Preston was placed in the care and custody of a non-relative resource home

---

[2] PCP is a mind-altering drug that can cause hallucinations, dissociation, paranoia, and overdose. NIDA. 2024, April 9. Psychedelic and Dissociative Drugs, https://nida.nih.gov/research-topics/psychedelic-dissociative-drugs (last visited March 27, 2025).

where he remained for approximately one year. Shortly after Preston's birth, his maternal grandparents contacted DCPP and expressed interest in caring for him. Hanna regrettably passed away in June 2023, and therefore, was not a subject of the judgment terminating parental rights.

Trent had a history of incarceration, convictions in New Jersey and Pennsylvania, domestic violence with two active final restraining orders, housing instability, transience, substance and alcohol abuse, and health issues. He also had no financial or emotional family support.

After Preston's placement in the non-relative resource home, DCPP offered various services to Hanna and Trent. Initially, Trent told DCPP caseworkers that he would not comply with "authority." Three days later, Trent told the DCPP caseworker that he would not comply with any services, "court-ordered or not." From September to December 2022, Trent did not attend court-ordered random urine drug screenings and a batterer's intervention program, did not complete a hair follicle drug test, a psychological evaluation, and a paternity test. Following a compliance hearing, Trent's visitation was suspended pending the completion of the paternity test and was reinstated the end of December after the test confirmed he was Preston's father.

A-3592-23

Trent completed the substance abuse evaluation in February 2023, but did not follow through with the recommended intensive outpatient treatment. He completed the court-ordered psychological evaluation with Dr. Renee R. Maucher in March 2023, but did not complete the recommended substance abuse and domestic violence evaluations. Dr. Maucher recommended the supervision requirements remain in place until Trent addressed his other issues, and that Trent obtain appropriate housing before consideration be given to reunification. Trent completed a urine screen in August 2023, and tested positive for marijuana. Thereafter, he failed to comply with court-ordered random urine screens, hair follicle testing, and domestic violence assessment and counseling.

From January to May 2023, Trent had generally positive but inconsistent supervised visitation with Preston at DCPP's local office. For a brief period, he had virtual visitation with Preston during a transient period while he was in Baltimore, Maryland in late May. Trent's sporadic in-person visitation with Preston resumed in June to September 2023 after Trent returned to New Jersey.

DCPP explored possible placements for Preston. In February 2023, the non-relative resource home expressed an interest in adopting Preston. Although DCPP discussed kinship legal guardianship (KLG) with the grandparents on at least four occasions, they were not interested in KLG and clearly stated their

preference for adoption. DCPP explored the grandparents as possible placements and initiated an Interstate Compact for the Placement of Children with Florida Child Protective Services.[3] The grandparents reported Hanna's death in June 2023 to DCPP and restated their interest to care for the child. In August 2023, the grandparents were approved to care for Preston in Florida.

Also in August, Trent resided with his parents in their home, which was assessed by DCPP. Thereafter, DCPP deemed Trent's parents' home safe, but Trent reported neither of his parents could assist him in parenting Preston.

In a September 14, 2023 order, the court approved DCPP's amended permanency plan for Preston from reunification to termination followed by adoption and the change in placement from the non-relative resource home to the maternal grandparents' home in Florida. Preston moved to Florida on September 21, 2023.

Trent attended several virtual visits with Preston that were arranged by the maternal grandparents. However, DCPP had to facilitate the virtual visits because they had become acrimonious. While the visits were generally positive,

---

[3] Preston's placement in Florida was accomplished through the Interstate Compact on the Placement of Children, N.J.S.A. 9:23-5. "The goal of the ICPC is to facilitate placements that serve the best interests of the children, whether interstate or intrastate." N.J. Div. of Youth & Fam. Servs. v. K.F., 353 N.J. Super. 623, 631 (App. Div. 2002) (internal citations omitted).

they were sporadic because Trent either missed or cancelled numerous virtual visits. Also, at times, Trent displayed aggression toward the grandparents during those visits.

Despite DCPP's continued efforts to gain Trent's compliance for services, he continued with his stated refusal to do a hair follicle screen "ever," to attend a urine screen, and to attend domestic violence counseling. In February 2024, Trent partially complied and completed a urine screen and tested positive for marijuana. He started, and did not complete, online domestic violence counseling. Trent also failed to comply with DCPP's request for an updated substance abuse evaluation.

Trent told the DCPP worker that he wanted to visit his son in Florida. DCPP twice attempted to assist Trent with flying to Florida to visit Preston, but Trent did not provide the requested documentation to confirm that he was physically able to fly given his health issues.

The two-day guardianship trial was held in June 2024. At trial, DCPP presented testimony from the DCPP adoption worker and expert witness, Dr. James Loving. DCPP also submitted numerous documents into evidence. Trent also testified and did not present any witnesses.

A-3592-23

Dr. Loving, a licensed clinical and forensic psychologist, was qualified as an expert. He testified Trent repeatedly said that he did not want to complete the psychological evaluation, claiming it was "unnecessary" because he "did not do anything wrong." Notwithstanding Dr. Loving's explanation regarding the significance of completing the psychological evaluation before the bonding evaluation, Trent said he understood and decided it was "best not to attend" and "it [was] not a good use of his time or [Dr. Loving's] time."

Dr. Loving completed a bonding evaluation with Preston and his grandparents. He testified that Preston displayed a "strong attachment to both of his grandparents" and in his view it was a "healthy and secure attachment to each of his grandparents." Dr. Loving opined that adoption would be "healthy for [Preston] to be in a home that [was] permanent."

In an oral opinion rendered on June 27, 2024, Judge Axelrad found DCPP's witnesses were credible. The judge then made detailed findings of fact, reviewed the applicable law, and made conclusions of law based on those facts.

Judge Axelrad found DCPP met each prong of the best-interests of the child test under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. In addressing prong three, Judge Axelrad was "surprised" that Trent argued Preston should have stayed in the non-relative resource home. The judge also found

Trent's argument "disingenuous" because there was no evidence that Preston had a bond with the unrelated resource caregiver. Preston also had the "opportunity" and "legal right of his own to be placed with a relative caregiver."

Nor did the judge find Trent's argument viable that DCPP put up a "barrier" between him and Preston by placing him in Florida with his grandparents. In considering alternatives to termination of parental rights, Judge Axelrad found KLG was not an "appropriate permanency option" because the maternal grandparents did not want KLG and had "legitimate concerns" regarding Trent's aggressive behavior, and Preston was "entitled to permanency and stability."

On appeal, Trent argues that the judge erred in finding DCPP did not put a barrier up by removing Preston from his non-relative resource home and placing him in Florida. In particular, Trent argues the proper placement should have been the non-relative resource family so that he could have had in-person visitation and continued his relationship with Preston. Lastly, Trent argues that the judge improperly weighed Dr. Loving's opinion that Preston would not suffer harm if Trent's parental rights were terminated. We are not persuaded by Trent's arguments and hold they lack merit.

A-3592-23

A review of the record establishes that each of the judge's findings concerning the four prongs is supported by substantial credible evidence. N.J.S.A. 30:4C-15.1(a); N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. 107, 115 (App. Div. 2021.) We do not consider these prongs as discrete and separate; rather, they overlap to inform a more general inquiry that the termination of parental rights is in a child's best interests. N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018).

In guardianship and adoption cases, such as here, it is well-established "[c]hildren have their own rights, including the right to a permanent, safe[,] and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). Preston has never resided with Trent. As we have often acknowledged, there is "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid.

Here, Judge Axelrad properly relied on Dr. Loving's unrebutted testimony supporting the maternal grandparents' adoption of Preston. Judge Axelrad considered other evidence, as well as Trent's actions and omissions, and ultimately determined Trent wanted to do what was "convenient" for him and "[he] want[ed] to be the one in charge, basically," which supported and

corroborated Dr. Loving's testimony.  We, therefore, conclude Judge Axelrad's factual findings are fully supported by the record and, in light of those facts, her unassailable legal conclusions are based on Preston's best interests.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

11