# **RECORD IMPOUNDED**

## **NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3835-19
A-3836-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

R.I.O.[1] and E.K.W.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
C.R.W. and R.K.W., minors.

_____

Submitted July 27, 2021 – Decided August 9, 2021

Before Judges Sumners and Firko.

_____

[1]  We use pseudonyms or initials to protect the privacy of the children and parents. R. 1:38-3(d)(12). We use first names for ease of reference; we mean no disrespect.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0092-19.

Joseph E. Krakora, Public Defender, attorney for appellant R.I.O. (Christine Olexa Saginor, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant E.K.W. (Stephania Saienni-Albert, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Nancy P. Fratz, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Following a trial concluding on March 2, 2020, Judge Linda Lordi Cavanaugh rendered an oral opinion, a seventy-three-page written opinion, and entered a May 28, 2020 order terminating the parental rights of R.I.O. (Rachel) and E.K.W. (Evan) to their sons, C.R.W. (Caden), and R.K.W. (Ryan). Caden was born in October 2017, and Ryan was born in January 2019. For the same reasons that follow, we reject Rachel and Evan's contentions that the Division of Child Protection and Permanency (Division) failed to meet its statutory

burden under the four-prong best interests test, codified at N.J.S.A. 30:4C-15.1(a), by clear and convincing evidence. The Division and Law Guardian seek affirmance.

I.

Caden was born at University Hospital with special medical needs and required an extended hospitalization. On November 21, 2017, Caden was transferred to Newark Beth Israel Medical Center (NBIMC) for placement of a gastronomy tube (G-tube) in order to address feeding issues. The Division first became involved in Caden's life on December 6, 2017, when medical personnel at NBIMC made a referral because two days earlier, a hospital security guard witnessed Evan hitting Rachel during an argument about where Caden was going to live upon his discharge.

The Division learned of the parents' financial difficulties and lack of suitable housing. Rachel and Evan had to sell their cellular phones in order to purchase bus tickets to visit Caden at the hospital. The Division's interview with Rachel revealed her argument with Evan was about her intention to live at her aunt's home with Caden, and her aunt did not want Evan to visit Caden. Rachel denied any domestic violence in her relationship with Evan. Rachel also told the investigators she applied for welfare and was residing in a shelter despite

3

available housing with her aunt in order to become eligible for temporary rental assistance (TRA).

Evan's interview revealed that he was unemployed but collected $844 a month in social security disability benefits, which he used to cover housing costs for himself and Rachel. When questioned about the altercation at the hospital, Evan also denied domestic abuse. Neither parent visited Caden at the hospital the weekend following their interviews, and consequently, they missed training on how to care for his physical needs. A Division worker advised Rachel that a request for bus tickets would be made to facilitate her visits with Caden, provide additional training on how to feed him using the G-tube, and run errands, including welfare appointments.

In addition, Division workers visited Rachel at the shelter and reinforced the need for Rachel and her aunt to receive additional training on the proper use of Caden's G-tube prior to his discharge because he was going to reside with them. Rachel was also provided with paperwork, which would enable her to apply for temporary employment.

Evan visited Caden on December 16, 2017, and received an update on his condition. A social worker contacted Rachel two days later about evaluating

4

Caden for admission to St. Clare's Hospital[2] where he would receive twenty-four-hour care.  Rachel objected to admitting Caden at St. Clare's.

On December 20, 2017, a hearing was held under the FN[3] docket, and the Family Part judge granted the Division care, custody, and supervision of Caden based on the Division's ongoing concerns about the parents' unstable housing and domestic violence.  On December 26, 2017, Caden was transferred from NBIMC to St. Clare's with a diagnosis of "poor oral feeding, [G-]tube placement."  Additionally, Caden was diagnosed with a milk allergy and severe eczema.

On January 5, 2018, both parents appeared at the court hearing represented by counsel.  The judge granted the parents liberal, unsupervised visitation with Caden at St. Clare's and ordered them to participate in training on his G-tube feedings.  The parents visited Caden but missed his January 11, 2018 medical appointment because they were looking for an apartment.

On February 1, 2018, Caden was transported to the NBIMC emergency department due to congestion.  He remained hospitalized there for four days.

---

[2]  The briefs refer to St. Clare's at St. Clare's Hospital and St. Clare's Home for Children interchangeably.  We refer to the hospital as St. Clare's.

[3]  Docket number FN-07-0243-18.

Despite the Division's offer to transport the parents to the hospital to see Caden, they did not visit him during the month of February 2018, with the exception of two visits by Rachel. The parents moved out of the shelter and did not inform the Division as to their new address.

In the months that followed, the parents' visitation with Caden declined—Rachel only saw Caden once on March 19, 2018, and Evan did not visit him at all. Caden's maternal grandparents, R.F. and P.F., and his maternal aunt, M.F., commenced visiting Caden at St. Clare's because they were being assessed as potential resource parents. Prior to court-ordered psychological evaluations being performed, Evan threatened a caseworker in March 2018, stating, "I don't want my son with anyone, I'm going to take you out and do what I have to do, I'm going to take the Division and the mother out (referring to the maternal grandmother) and nobody is going to mess with my son." Both parents were referred to Wraparound Intensive Services for Families for parenting skills classes but failed to attend.

Rachel underwent a psychological evaluation with Denise M. Williams Johnson, Ph.D., who recommended that Rachel attend weekly individual counseling and substance abuse education, undergo random drug screens, consult with a domestic violence liaison, and receive additional G-tube training.

6 <span>A-3835-19</span>

Evan refused to attend a psychological evaluation. Instead, Dr. Williams reviewed Division records regarding Evan and noted he had been diagnosed with depression and a learning disability[4] and was non-compliant with his psychiatric medication. Rachel attended the substance abuse assessment but failed to comply with treatment or domestic violence counseling.

Both parents failed to appear at the June 8, 2018 summary hearing. The maternal grandparents, R.F. and P.F., continued to visit Caden and receive the requisite training for his medical needs. The Division submitted an interstate assessment of R.F., who resides in Pennsylvania. Rachel and Evan continued to be unemployed and share a room in a boarding house. Their visits with Caden continued to be sporadic. Caden continued to improve in terms of growth, speech, and feeding therapies, but had not achieved appropriate developmental milestones, such as walking and talking, after his first birthday.

On November 1, 2018, R.F. and P.F. were approved as a resource placement for Caden through the Interstate Compact for the Placement of Children (ICPC). R.F. offered to bring Caden to New Jersey for visitation purposes, but Rachel and Evan were nonresponsive to attempts made by the

---

[4] The record only reflects that a Division case note states Evan was diagnosed with autism and has a history of mental illness.

Division to arrange a visitation schedule. Rachel and Evan did not attend the December 19, 2018 permanency hearing. The judge approved the Division's proposed permanency plan for Caden, which included termination of Rachel's and Evan's parental rights followed by adoption by R.F.

In January 2019, Rachel gave birth to Ryan, who was born without medical complications. Hospital staff notified the Division upon Ryan's birth because Rachel had been placed on an "alert list." Evan was ordered to undergo a paternity test because Rachel did not list him as Ryan's father on the birth certificate.[5] After Rachel misrepresented her living arrangements to the Division, Ryan was removed from Rachel's care.[6] At the time of Ryan's birth, both parents were unemployed and noncompliant with Division services. On January 8, 2019, the judge held a hearing on an order to show cause with respect to the care, custody, and supervision of Ryan. Neither Rachel nor Evan attended the hearing. The judge granted the Division care, custody, and supervision of

---

[5] Evan's paternity of Ryan was not confirmed until October 2019 because Evan missed three scheduled testing appointments.

[6] The record refers to the removal as an "emergency removal." A <u>Dodd</u> removal is an emergent removal of a minor without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82, known as the Dodd Act. <u>N.J. Div. of Youth & Family Servs. v. P.W.R.</u>, 205 N.J. 17, 26 n.11 (2011).

Ryan and instructed the Division to place him in a non-relative resource home in Newark, rather than with R.F. in Pennsylvania, in order to facilitate visitation for Rachel and Evan.

By way of a letter dated January 23, 2019, the Division advised Rachel and Evan that Caden's permanency goal was changed from reunification to adoption, but the parents could work toward reunification with Ryan. On January 30, 2019, the Division filed a verified complaint for guardianship of Caden. Rachel and Evan failed to visit Ryan during the month of January. Consequently, on February 8, 2019, the judge ordered Ryan be placed at R.F.'s home, along with Caden. The parents failed to maintain contact with the Division and their children throughout the month of February.

The judge conducted monthly case management review hearings relative to Caden's guardianship matter between March 2019 and January 2020. On May 3, 2019, Rachel and Evan failed to appear for Ryan's permanency hearing, and the judge granted the Division's application to amend the guardianship complaint to include Ryan. In addition, the judge approved the Division's plan to terminate Rachel and Evan's parenting rights to both children followed by adoption by R.F. and P.F., who expressed their willingness to adopt.

After failing to visit their children in May and June 2019, the Division arranged for supervised visitation between the parents and the children commencing July 7, 2019, and every Sunday thereafter. Visitation by Rachel and Evan was sporadic. In August 2019, both parents underwent substance abuse assessments. Rachel tested positive for marijuana, was referred to drug treatment, and was ultimately discharged from the program due to noncompliance. Evan also tested positive for marijuana and benzodiazepines. He was referred to treatment but did not attend.

The parents appeared for the September 2019 case management conference. They also attended a supervised visit with their children on September 27, 2019, in Pennsylvania. Mark Singer, Ed.D. performed individual psychological evaluations and bonding evaluations—one between the children and the parents and one between the children and the grandparents.

In his November 25, 2019 report, Dr. Singer concluded as to Evan:

> Overall, [Evan], based upon the data, is an impulsive individual who is likely to continue to use substances and to have difficulty creating and maintaining appropriate stability in his own life, never mind in the lives of the [two] children with whom he has never resided and with whom he has not had consistent contact with.

Dr. Singer's findings with respect to Rachel stated, "[Rachel], much like [Evan], is likely to continue to struggle with substance use issues (although minimizing these issues), residential stability, [and] is likely to have difficulty complying with limits placed on her behavior . . . ." On the issue of stable housing, Dr. Singer opined: "Despite significant time, the data suggest that both [Rachel] and [Evan], either individually or collectively, will likely continue to struggle with residential instability." Overall, Dr. Singer found the data did not suggest Rachel and Evan were "viable parenting options for these children" and were "not likely [to] become viable parenting options in the foreseeable future."

The Division began providing transportation for Rachel and Evan to visit their children in Pennsylvania. On November 20, 2019, Division personnel were transporting Rachel and Evan back from a visit when the couple began arguing in the back of the worker's car, prompting the worker to pull over. Evan was apparently agitated by Rachel's request to be dropped off in downtown Newark and pulled on Rachel's clothes, threw her cellular phone out of the window, jumped on top of Rachel, and began biting Rachel's face while Rachel screamed. The worker sought police intervention which caused Evan to flee. Then, the worker transported Rachel to a Division office, and Rachel was placed in a

11

safehouse. Following this incident, the trial court suspended Evan's visitation rights from November 2019 to January 2020.

On December 19, 2019, Rachel successfully completed the parenting skills program. The next day, December 20, 2019, was Rachel's last day at the safehouse. Rachel was not eligible for an extension because she had two unauthorized overnight absences, missed two counseling sessions, and did not participate in services.

At the March 2, 2020 trial, the Division presented two witnesses, Dr. Singer, and N.T.E., a Division worker assigned to the adoption unit. The Law Guardian supported the Division's application to terminate both Rachel and Evan's parental rights. Neither the Law Guardian nor the parents presented any witnesses, and Evan did not appear for trial.

Dr. Singer testified that Evan minimized his shortcomings by denying his substance abuse issues and any incidents of domestic violence. Additionally, Evan blamed his lack of visitation on the Division, claiming it was the Division's responsibility to transport him to the visits. Evan acknowledged his inability to provide stable housing for the children, a significant factor in light of Caden's ongoing medical needs.

12

As to Rachel, Dr. Singer opined her prognosis to change was poor. In addition to her lack of housing, Dr. Singer found Rachel's inability to complete a substance abuse program to be troubling. He explained that Rachel's longest period of sobriety lasted eight months, and sustainable remission with a decreased risk of relapse does not occur until twelve months. And, Rachel continued to use illicit substances despite ongoing litigation and referrals for treatment.

Finally, Dr. Singer described the bonding evaluations. Dr. Singer testified that the children were comfortable with Rachel and Evan but did not view them as attachment figures. There was minimal verbal and physical interaction between the children and their parents, and when leaving the room, the parents did not kiss their children goodbye.

On the other hand, Dr. Singer described the bonding evaluation between Caden and Ryan and R.F. and P.F. as a "very free-flowing session." The children were both spontaneously verbal and responsive. Caden also felt free to explore the room in order to gather toys and play with his grandparents. Dr. Singer opined that the children viewed R.F. and P.F. as their psychological parents because the grandparents have been the "only consistent, healthy, accessible caregivers" in the boys' lives. Moreover, the children would

13

experience a negative reaction to separation from their grandparents which Rachel and Evan would not be able to mitigate. Based upon these evaluations, Dr. Singer supported the plan of termination of parental rights followed by adoption by R.F. and P.F.

N.T.E., the Division caseworker, also testified that Rachel and Evan did not provide proof of stable housing, and Rachel failed to provide recent pay stubs. In sum, because the proofs were lacking, the Division concluded the parents failed to remediate the issues of stable housing and employment, which led the Division to seek a resource placement for the children.

The judge determined the Division proved all four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence, terminated the parental rights of Rachel and Evan, awarded the Division guardianship of Caden and Ryan, and directed it file its complaint for adoption. This appeal followed.

## II.

In reviewing a decision by a trial court to terminate parental rights, we give "deference to family court[s'] fact[-]finding" because of "the family courts' special jurisdiction and expertise in family matters." Cesare v. Cesare, 154 N.J. 394, 413 (1998). The judge's findings of fact are not disturbed unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and

14

reasonably credible evidence as to offend the interests of justice." Id. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). "[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006).

Here, the judge carefully reviewed the evidence presented, and thereafter concluded the Division had met, by clear and convincing evidence, all the legal requirements for a judgment of guardianship. Her oral opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a), accords with In re Guardianship of K.H.O., 161 N.J. 337 (1999), In re Guardianship of D.M.H. 161 N.J. 365 (1999), N.J. Division of Youth & Family Services. v. F.M., 211 N.J. 420 (2012), and is supported by substantial credible evidence in the record. We therefore affirm substantially for the reasons the judge expressed in her comprehensive and well-reasoned opinions. We add the following remarks as to each prong.

A. Prongs One and Two

As to prong one, the Division must prove that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1). "[T]he relevant inquiry focuses on

the cumulative effect, over time, of harms arising from the home life provided by the parent." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 289 (2007).

"Serious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (citing In re Guardianship of J.C., 129 N.J. 1, 18 (1992)).  As a result, "courts must consider the potential psychological damage that may result from reunification[,] as the 'potential return of a child to a parent may be so injurious that it would bar such an alternative.'" N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 480-81 (App. Div. 2012) (quoting N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 605 (1986)).

"The absence of physical abuse or neglect is not conclusive." A.W., 103 N.J. at 605 (quoting In re Guardianship of R., 155 N.J. Super. 186, 194 (App. Div. 1977)).  "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." D.M.H., 161 N.J. at 379.  "Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." Id. at 383 (citation omitted).

As to prong two, the Division must prove that "[t]he parent is unwilling or unable to eliminate the harm facing the child[ren] or is unable or unwilling to provide a safe and stable home . . . and the delay of permanent placement will add to the harm." N.J.S.A. 30 4C-15.1(a)(2). Harm may include evidence that separating the children from their resource parents "would cause serious and enduring emotional or psychological harm." Ibid.

The Division can establish the second prong by proving that a "child will suffer substantially from a lack of stability and a permanent placement[,] and from the disruption of" a bond with the resource parents. K.H.O., 161 N.J. at 363. Because they are related, evidence supporting the first prong may also support the second prong "as part of the comprehensive basis for determining the best interests of the child." D.M.H., 161 N.J. at 379.

Here, based on the judge's credibility findings of the Division's witnesses—Dr. Singer and N.T.E.—there is clear and convincing evidence to support the judge's finding that a continued parental relationship with Rachel and Evan would harm Caden and Ryan because of the parents' problematic behaviors and their instability. Moreover, despite numerous opportunities to do so, Rachel and Evan had not remedied the circumstances leading to the placement of their first child, Caden, in 2017.

Under the first prong, the judge determined Evan's actions demonstrated "a complete inability, unwillingness, or utter lack of interest" in complying with Division services that would have enabled Evan to provide a safe and stable home for his children. Evan never provided the Division with proof of employment or stable housing throughout the entirety of the litigation. He also never attended services, including domestic violence counseling, drug assessment, and parenting classes; missed several paternity tests to establish paternity of Ryan; and failed to visit his children with regularity, which the judge found to be "extremely telling" and evidenced a "lack of interest."

Although Rachel was more compliant with the Division than Evan, the judge still found her unable to remedy the issues which led to the removal of her two sons. Rachel lacked stable housing for several years and had not provided proof of stable housing at the time of the guardianship trial. Moreover, she was only able to provide proof of employment for one month, October 2019. The court described Rachel's compliance with services as "sporadic, at best" which hindered her ability to achieve long term stability, and that visitation with her sons was "simply not consistent."

Also of "substantial concern" under this prong was the couple's history of volatility and domestic violence. While the children did not witness the

domestic violence, the judge found, "[Evan] simply denies or simply refuses to acknowledge his violent nature, although there is ample evidence of his threats to the resource parent and caseworker and his physical assaults on [Rachel]." In addition, the judge emphasized "[a]lthough [Rachel] has often denied the existence of domestic violence, she has met with the domestic violence liaison on more than one occasion and has pursued counseling." However, these efforts were undermined by Rachel's continuing relationship with Evan despite being advised by the Division "that a continuing relationship with [Evan] would jeopardize her chances of having the children placed [with] her."

As to the second prong, the judge found neither parent "cured or overcame the initial harm that endangered the health, safety, and welfare" of their children because Evan's "virtually nonexistent cooperation and compliance," and Rachel's "minimal cooperation and compliance," resulted in the couple's "complete lack of meaningful progress achieved." The judge highlighted that Evan did not take advantage of either the repeated referrals or opportunities to visit his children and minimized his personal responsibility for the Division's involvement with his family. It was "very clear" to the judge that Evan had sufficient time to remediate the deficits in his parenting but was either unable or

unwilling to do so. We are satisfied the record fully supports the judge's findings as to prongs one and two.

B. Prong Three

As to prong three, the Division is required to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[,] and the court [will] consider[] alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). This prong "contemplates efforts that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into foster care." K.H.O., 161 N.J. at 354.

The Division must prove that it "has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts" include but are not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation.

[N.J.S.A. 30:4C-15.1(c).]

"Whether particular services are necessary in order to comply with the [reasonable] efforts requirement must . . . be decided with reference to the circumstances of the individual case before the court . . . ." D.M.H., 161 N.J. at 390.

The Division

> must encourage, foster and maintain the bond between the parent and the child as a basis for the reunification of the family. [It] must promote and assist in visitation and keep the parent informed of the child's progress in foster care. [It] should also inform the parent of the necessary or appropriate measures he or she should pursue in order to continue and strengthen that relationship and, eventually, to become an effective caretaker and regain custody of his or her children.
>
> [Id. at 390 (citing N.J.S.A. 30:4C-15.1(c)).]

A court is required to consider alternatives to the termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3). "[A]ssessment of relatives is part of the Division's obligation to consult and cooperate with the parent in developing a plan for appropriate services that reinforce the family structure." N.J. Div. of Youth & Fam. Servs. v. K.L.W., 419 N.J. Super. 568, 583 (App. Div. 2011).

N.J.S.A. 30:4C-12.1(a) requires the Division to initiate a search for relatives who may be willing and able to provide the care and support required by the child within thirty days of accepting a child into its care or custody. The Division must assess each interested relative and, if it determines that the relative is unable or unwilling to care for the child, inform them of its reasons for a denial of placement. N.J.S.A. 30:4C-12.1(a)-(b).

"It is the policy of [the Division] to place, whenever possible, children with relatives when those children are removed from the custody of their parents." N.J. Div. of Youth & Fam. Servs. v. K.F., 353 N.J. Super. 623, 636 (App. Div. 2002). "The Division's statutory obligation does not permit willful blindness and inexplicable delay in assessing and approving or disapproving a relative know to the Division[.]" K.L.W., 419 N.J. Super. at 582. It cannot ignore relatives "based upon an arbitrary, preordained preference for the foster placement" and "must perform a reasonable investigation of . . . relatives that is fair, but also sensitive to the passage of time and the child's critical need for finality and permanency." N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013).

Under this prong, an alternative to termination of parental rights is Kinship Legal Guardianship (KLG). KLG allows a relative to become the

child's legal guardian and commit to care for the child until adulthood, without stripping parental rights. N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 508 (2004). The Legislature created this arrangement because it found "that an increasing number of children who cannot safely reside with their parents are in the care of a relative or family friend who does not wish to adopt the child or children." N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 222-23 (2010).

While KLG is "a more permanent option than foster care when adoption 'is neither feasible nor likely,'" the State's public policy heavily favors permanency. P.P., 180 N.J. at 512 (quoting N.J.S.A. 3B:12A-6(d)(3) to (4)). Consequently, "when a caretaker . . . unequivocally asserts a desire to adopt," the standard to impose a KLG is not satisfied because the party seeking a KLG arrangement will not be able to show that adoption is neither feasible nor likely. N.J. Div. of Youth & Fam. Servs. v. T.I., 423 N.J. Super. 127, 130 (App. Div. 2011). In other words, when permanency through adoption is available to a child, KLG cannot be used as a defense to the termination of parental rights. N.J. Div. of Youth & Fam. Servs. v. D.H., 398 N.J. Super. 333, 341 (App. Div. 2008).

For the first time on appeal, Evan contends there is no competent evidence in the record to support a finding that R.F. and P.F. were committed to adopting their grandchildren. Evan claims the hearsay statements from the Division worker who testified at the guardianship trial were insufficient to establish by clear and convincing evidence that the grandparents were "committed unambiguously, unequivocally, and unconditionally to adoption, regardless of the possible alternative of KLG." N.J. Div. of Child Prot. and Permanency v. M.M., 459 N.J. Super. 246, 273 (App. Div. 2019). We disagree.

The grandparents' desire to adopt Caden and Ryan is undisputed. R.F. and P.F. have been committed to adoption as early as their completion of the ICPC form on which R.F. indicated adoption as her permanency option of choice. The record shows the Division regularly documented R.F.'s and P.F.'s desire to adopt the children in its case notes. At the guardianship trial, the judge considered the testimony of the Division worker about the grandparents' commitment to adopt the children, which Rachel and Evan did not object to. Further, the Division admitted into evidence R.F.'s acknowledgement of the fact sheet explaining KLG and adoption, which demonstrated that the Division informed the grandparents about different permanency options. Because the Division demonstrated that adoption was both feasible and likely, the judge properly

concluded there was no alternative to termination of parental rights under prong three.  T.I., 423 N.J. Super. at 130.

C.  Prong Four

Under prong four, the Division must demonstrate by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4).  The prong characterizes a child's need for permanency as "an important consideration."  M.M., 189 N.J. at 281.  "The question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents."  K.H.O., 161 N.J. at 355.  In order to weigh any potential harm from terminating parental rights against a child's separation from his or her foster parents, a court must consider expert testimony on the strength of each relationship.  J.C., 129 N.J. at 25.  "[W]here it is shown that the bond with foster parents is strong and, in comparison, the bond with the natural parent is not as strong, that evidence will satisfy . . . N.J.S.A. 30:4C-15.1(a)(4) . . . ."  K.H.O., 161 N.J. at 363.

Rachel asserts that the judge erred by giving undue weight to Dr. Singer's expert opinion because his assessment was "outdated, unreliable, and

incomplete." She also argues the Division failed to provide Dr. Singer with updates related to her "successful completion of a parenting skills course, her full-time employment at UPS, her consistent and very positive visits with her children, . . . her termination of her relationship with [Evan] and that there were no additional domestic violence incidents." Evan contends there was insufficient evidence in the record to support a finding termination of parental rights will result in permanency for Caden and Ryan and that separation from a biological parent is a harm in and of itself. Again, we disagree.

"[T]o satisfy the fourth prong, the State should offer testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." F.M., 211 N.J. at 453 (quoting M.M., 189 N.J. at 281). Termination is appropriate, "even in the absence of evidence showing that [the child] has bonded with [the] foster parents," if the court is presented with "a clear and compelling record warranting the termination of parental rights." N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 623 (App. Div. 2007).

Here, the Division proffered the expert opinion of Dr. Singer, who had a full opportunity to assess each parent individually as well as perform bonding

evaluations for the family. Based on his unrefuted evaluations and observations, Dr. Singer opined both children view R.F. and P.F. as significant parental figures and as their psychological parents. Moreover, Dr. Singer testified that neither Rachel nor Evan "developed, or maintained, a healthy meaningful relationship" with the children. If the judge were to remove the children from the grandparents' care, Dr. Singer found the children would likely experience a negative reaction.

In finding the Division satisfied prong four, Judge Cavanaugh found neither parent was a viable parenting option as of the time of trial, nor would they become a viable parenting option in the future. The judge reasoned termination of parental rights would provide "permanency, stability, and safety" for Caden and Ryan. In balancing the relationships, the judge found that since the biological parents were not a viable parenting option, delaying permanency and separating the children from their grandparents would result in harm to the children.

Considering the credible evidence cited by the judge, she properly determined the Division satisfied prong four by clear and convincing evidence. We conclude the judge's termination of Rachel and Evan's parental rights was in the children's best interests.

27

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3835-19