895 So.2d 1181 (2005)
DEPARTMENT OF CHILDREN AND FAMILIES, Appellant,
v.
Teresa FELLOWS, Appellee.
No. 5D03-3261.
District Court of Appeal of Florida, Fifth District.
February 18, 2005.
*1182 Ralph J. McMurphy, of Dept. Children & Families, Wildwood, for Appellant.
Wilson Arnes, Jr., Community Legal Services of Mid-Florida, Inc., Tavares, for Appellee.
THOMPSON, J.
The Department of Children and Family Services ("department") appeals an order requiring the return of C.T., a minor, to New Hampshire pursuant to the Interstate Compact on the Placement of Children ("ICPC")[1] and terminating the department's supervision after New Hampshire recommended that C.T. be returned to Florida. We reverse.
This case began in July 2000 when the department filed a shelter petition for C.T. and C.T.'s sibling. After the mother and C.T. were reunified, the department filed another shelter petition in January 2002, and the court determined that the child was dependent.[2] Thereafter, a status review report recommended that C.T. be allowed to live in New Hampshire where his aunt, Teresa Fellows, resided. The trial court found the department to be in compliance with the ICPC and ordered a home study of the aunt. The New Hampshire Department of Health and Human Services ("New Hampshire") conducted a home study and recommended that C.T. be placed with the aunt.
After C.T. was placed with the aunt, New Hampshire sent two reports to the department recommending that C.T. be returned to Florida. The reports detailed the deteriorating conditions of the placement: C.T. became so violent when the aunt tried to discipline him that the police had to be called; he refused to attend church or youth group, he was defiant towards females; and he resisted going to his needed therapy. He stated that he was going to die soon, but when asked how, he stated he did not know. The second report stated that C.T. did not want to go to school and had threatened to run away to Florida or Mexico. More important, New Hampshire wrote that the aunt was unable to meet C.T.'s needs, could not transport him to his therapy, and had struck C.T. twice with a paddle. Finally, New Hampshire reported that the *1183 aunt had moved to a two-bedroom trailer and that C.T. was sleeping in the attached garage or carport. After receiving the reports, the department brought C.T. to Florida and filed a shelter petition for placement in Florida.
Several hearings were held in Florida, and a mental health evaluation report made the court aware of C.T.'s psychological problems, which also manifested themselves as physical problems. The record is clear that C.T.'s mother and entire family had been residents of New Hampshire for generations and that C.T. had no family members living in Florida. Finally, the aunt appeared in court and testified concerning the living conditions in her household. She told the trial court that she and C.T. wanted to be reunited in New Hampshire. The court also reviewed the general master's recommendation that C.T. be returned to New Hampshire to the aunt. Thereafter, the trial court ordered C.T. to be returned to New Hampshire into the aunt's custody over the department's objections. The court also terminated supervision of the child.
On appeal, the department argues that the trial court violated the ICPC by returning C.T. to the aunt over the opposition of the New Hampshire authorities. Section 409.401, Florida Statutes, Florida's codification of the ICPC, provides in Article III(d):
The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.

(Emphasis supplied).
In the instant case, Florida initially placed C.T. in New Hampshire with the aunt after it received a positive home study as required by Article III(d). However, New Hampshire subsequently recommended that C.T. be returned to Florida because it was believed that the aunt could no longer meet C.T.'s needs. In essence, New Hampshire rescinded its placement approval. Pursuant to Article V(a) of the ICPC, Florida retained jurisdiction, and the child was returned to the department's custody in Florida.
In deciding this case, we must determine whether the ICPC applies to placement with the aunt, and if it does, whether Florida was required to receive a second approval from New Hampshire before returning C.T. to New Hampshire. After reviewing Department of Children and Families v. Benway, 745 So.2d 437, 438 (Fla. 5th DCA 1999), and the ICPC, as codified in section 409.401, Florida Statutes, we conclude that the ICPC applies to the aunt, and that the trial court had no authority to return C.T. to New Hampshire without a reapplication of Article III(d).
In Benway, we determined that the ICPC applied to the out-of-state placement of a child with a natural parent. Id. at 439. This court discussed the reasons for the ICPC and pointed out: "Once a court has legal custody of a child, it would be negligent to relinquish that child to an out-of-state parent without some indication the parent is able to care for the child appropriately. The ICPC provides an effective mechanism for gleaning the evidence and for maintaining a watchful eye over the placement." Id. See also H.P. v. Dep't of Children & Families, 838 So.2d 583 (Fla. 5th DCA 2003) (holding that the ICPC is applicable to the placement of a child with a non-resident parent who had no previous custodial rights). If the ICPC applies to natural parents of a dependent child, then *1184 it applies to relatives of a dependent child; in this case, the aunt.
The next issue is whether once the receiving state rescinds its placement approval, the sending state can return the child without a reapplication. We conclude that it cannot. The purpose of the ICPC is to ensure that the child's interests are protected when the child is moved from one state to another. The ICPC is an agreement between the signatories to facilitate interstate placement of dependent and adoptive children in environments that "serve the best interests of the children, whether interstate or intrastate." Bernadette W. Hartfield, The Role of the Interstate Compact on the Placement of Children in Interstate Adoption, 68 Neb. L.Rev. 292, 297 (1989). The ICPC was developed to maximize the placement and monitoring of dependent children by removing the limitations imposed by state boundaries, increasing the flow of information between cooperating states and providing guidelines for resolving jurisdictional conflicts. Id. A receiving state conducts an investigation and reports in writing, before the child is approved for placement, to the sending state to ensure that "the proposed placement does not appear be to be contrary to the interests of the child." § 409.401, Art. III(d), Fla. Stat.
In Benway, this court held that a dependent child should remain in Florida until Vermont authorities agreed that the child should be placed in Vermont. Id. at 439. This court reasoned that once a court has custody of a child, it would be negligent to relinquish a child to an out-of-state placement or parent without an indication that the placement would be appropriate for the child. Id. Additionally, in Department of Health and Rehabilitative Services v. J.M.L., 455 So.2d 571 (Fla. 1st DCA 1984), the district court reversed an order placing the dependent children in Georgia where Georgia disapproved the placement.
In this case, New Hampshire officials reported the reasons for revoking placement approval: The child was acting out and could not be controlled by the aunt. The child had been paddled on two occasions, which was detrimental to the mental health of the child because of his previous emotional history. The aunt had not been taking the child to receive essential mental health therapy. Finally, New Hampshire evaluated the aunt's new living arrangements and determined that they were contrary to the best interests of the child. We find no legal support for the argument that once a receiving state revokes approval, the child can be returned to the disapproved placement. As we view the ICPC, once the placement is disapproved, the sending state cannot send the child to the receiving state until the requirements of Article III(d) are met again. See J.M.L., 455 So.2d at 572.
We sympathize with the trial court because it tried to fashion a resolution that would allow the child to remain with family. However, the purpose of the ICPC is to protect children who are placed out-of-state. As we stated in H.P. v. Department of Children and Families, 838 So.2d 583 (Fla. 5th DCA 2003):
Although we can detect the trial court's frustration with any delay inherent in following ICPC procedures, finding the ICPC process unconstitutional in the absence of a challenge by a party in order to ignore ICPC procedures seems extreme. Florida has joined the compact to ensure protection and services to children who are placed across state lines, and should the need to out-of-state placement cease, Florida must be confident *1185 that a system exists to return the child to this state.

Id. at 584-585 (emphasis supplied).
The ICPC requires that the receiving state evaluate the placement before the child is placed and then monitor the placement to protect the child. Here, once the placement was determined to be inappropriate, the child could not be returned until the receiving state reapproved the placement. The trial court could not send the child to New Hampshire unless it complied with "each and every requirement set forth" in Article III.[3] Finally, we note that Article IV of the ICPC requires Florida to comply with the terms of the ICPC or be subject to penalties, including liability for not complying.
REVERSED and REMANDED for hearing consistent with this opinion.
MONACO and TORPY, JJ., concur.
NOTES
[1] purpose of the ICPC is to facilitate cooperation between states in the placement and monitoring of dependent children. § 409.401, Fla. Stat. (2001); Dep't of Children & Families v. Benway, 745 So.2d 437, 438 (Fla. 5th DCA 1999). The ICPC is primarily procedural, and it governs the relations between states when decisions are made as to where to place a dependent child. Benway, 745 So.2d at 438; J.D.S. v. Franks, 182 Ariz. 81, 893 P.2d 732, 740 (1995) (en banc). Essentially, the ICPC compact administrator in the "sending state" recommends a placement and provides the "receiving state" with information concerning the proposed placement. § 409.401, art. III, Fla. Stat. (2001). The ICPC compact administrator in the "receiving state" then determines whether, in his or her opinion, the placement is appropriate. Id.
In re D.N., 858 So.2d 1087, 1093 (Fla. 2d DCA 2003).
[2] The petition alleged that the mother advised a friend she was traveling to Texas to cross the border to Mexico with the children, and based on the mother's conduct, the department was unable to secure the children. After the mother absconded to Mexico with C.T. and C.T.'s siblings, in October 2002, a department counselor filed a status review report indicating that C.T. traveled from his home in Mexico to Brownsville, Texas. The police realized there was an Order to Take into Custody Missing or Endangered Children, and took CT. into custody. C.T. was returned to Florida where he was placed in foster care.
[3] ARTICLE III. Conditions for Placement.

(a) No sending agency shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein.