# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

Case No. 5D2024-3280
LT Case No. 55-2023-DP-56

———————————————

GUARDIAN AD LITEM,

    Petitioner,

    v.

DEPARTMENT OF CHILDREN AND
FAMILIES,

    Respondent.

———————————————

Petition for Certiorari Review of Order
from the Circuit Court for St. Johns County.
Christopher Scott Ferebee, Judge.

Sara Elizabeth Goldfarb, Statewide Director of Appeals, and
Laura J. Lee, Assistant Director of Appeals, of Statewide
Guardian ad Litem Office, Tallahassee, for Petitioner.

Meredith K. Hall, of Children's Legal Services, Bradenton,
for Respondent.

February 26, 2025

PRATT, J.

    The Guardian Ad Litem ("GAL") petitions for a writ of
certiorari to quash the trial court's order granting the motion of
the Department of Children & Families ("DCF") to modify
placement of nine-year-old B.G. The child had been placed in his

mother's home in Kentucky with that state's consent pursuant to the Interstate Compact on the Placement of Children ("ICPC"), as enacted by the Florida Legislature in section 409.401, Florida Statutes (2024). DCF's motion sought to modify B.G.'s placement away from his mother—with whom he and his sister had been reunified for several months—to foster care in Florida. DCF filed its motion after the State of Kentucky's unilateral demand to pick up the child. Kentucky had demanded B.G.'s return to Florida because it believed the mother was unable to adequately control his concerning behaviors, which put at risk other children in the home, and Kentucky was either unable or unwilling to provide the services that the child required.

The trial court's order complied with binding precedent. In *Department of Children & Families v. Fellows*, we reversed an order requiring a child's return to another state under materially similar circumstances,[1] holding that "the trial court had no authority to return [the child] to [the other state] without a reapplication of Article III(d)" of the ICPC. 895 So. 2d 1181, 1183 (Fla. 5th DCA 2005). In other words, we construed the ICPC to authorize the other state to unilaterally "rescind[ ] its placement approval," and we held that "Florida was required to receive a second approval from" the other state before returning the child. *Id.*

In light of our court's controlling decision in *Fellows*, we must deny the GAL's petition. *See Dep't of Child. & Fams. v. Campbell*, 295 So. 3d 868, 870 (Fla. 5th DCA 2020) (requiring, among other showings, "a departure from the essential requirements of the law"

---

[1] The GAL notes that *Fellows* concerned an interstate placement with an aunt, whereas this case concerns an interstate placement with a parent. But the GAL does not present an argument why this distinction matters under the ICPC's text. Rather, as we more fully explain in footnote 2, *infra*, the GAL affirmatively concedes that the ICPC governed B.G.'s initial placement with his mother in Kentucky. Because the GAL concedes that the ICPC governed the initial placement, we discern no satisfactory basis to distinguish *Fellows*' holding that the ICPC authorizes a receiving state to rescind its placement approval.

to obtain a writ of certiorari); *see also Allstate Ins. Co. v. Kaklamanos*, 843 So. 2d 885, 889 (Fla. 2003) ("[T]he departure from the essential requirements of the law . . . is something more than a simple legal error. A district court should exercise its discretion to grant certiorari review *only* when there has been a violation of a clearly established principle of law resulting in a miscarriage of justice."). However, we note that *Fellows* did not meaningfully engage with the relevant statutory text. *See, e.g.*, *Fellows*, 895 So. 2d at 1184 ("The purpose of the ICPC is . . . ."); *id.* ("The ICPC was developed to . . . ."); *id.* ("However, the purpose of the ICPC is . . . ."). We therefore write to encourage our court to reexamine *Fellows* in an appropriate future case and perform the textual analysis that *Fellows* omitted. *See Pecchia v. Wayside Ests. Home Owners Ass'n*, 388 So. 3d 1136, 1140 (Fla. 5th DCA 2024) ("When interpreting a statute, we follow the supremacy-of-text principle—namely, the principle that the words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." (internal quotation marks and brackets omitted)). Below, we briefly sketch how such an analysis could cut against *Fellows*' conclusion.

The ICPC establishes the procedures by which "the party states . . . cooperate with each other in the interstate placement of children." § 409.401, art. I, Fla. Stat. A "placement" is defined as "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution but does not include any institution caring for the mentally ill, mentally defective or epileptic or any institution primarily educational in character, and any hospital or other medical facility." *Id.* § 409.401, art. II(d). A placement occurs when a "sending agency" (here, a Florida agency) "sends, brings, or causes to be sent or brought any child to another party state," called the "receiving state" (here, Kentucky). *Id.* § 409.401, art. II(b), (c).

The ICPC provides that "[n]o sending agency shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in [article III of the ICPC] and with the applicable laws of the receiving state governing the placement

3

of children therein." *Id.* § 409.401, art. III(a).[2] The ICPC requires the sending agency to furnish to the prospective receiving state

[2] It seems to us that B.G.'s placement with his mother in Kentucky constituted neither "foster care" nor "a preliminary to a possible adoption." *Id.* § 409.401, art. III(a). We likewise question whether it was an "arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution." *Id.* § 409.401, art. II(d). Indeed, for these reasons, the Kentucky Supreme Court has held "that the ICPC does not apply to interstate placements of children with their biological parents." *A.G. v. Cabinet for Health & Fam. Servs.*, 621 S.W.3d 424, 432 (Ky. 2021).

But throughout these proceedings, both in the trial court and before us, DCF and the GAL nonetheless have maintained that the ICPC governed B.G.'s placement with his mother. That position aligns with our precedent (even if not the precedent of the Kentucky courts). *See Dep't of Child. & Fams. v. Benway,* 745 So. 2d 437, 439 (Fla. 5th DCA 1999) (holding that "the ICPC is applicable to an out-of-state placement of a dependent child with a natural parent"); *see also D.R. v. J.R.*, 203 So. 3d 952, 955–56 (Fla. 5th DCA 2016) (reaffirming *Benway* and rejecting the validity of an AAICPC regulation—not adopted into Florida law—that would exempt from the ICPC certain out-of-state placements with natural parents). In any event, given the parties' apparent agreement that the ICPC applied to B.G.'s placement, we do not address the issue. We wouldn't reach it even if the petition had raised it. *See Firstservice Residential Fla., Inc. v. Rodriguez*, 261 So. 3d 674, 676 (Fla. 5th DCA 2018) ("Florida courts agree that a petitioner cannot raise in a petition for writ of certiorari a ground that was not raised below.").

However, we note that this issue—whether Article III of the ICPC applies to placements with natural parents—is the subject of a deep, nationwide split in authority. *See In Int. of C.R.-A.A.*, 521 S.W.3d 893, 903–08 (Tex. App. 2017) (compiling cases that illustrate the nationwide split, and concluding that, by its "plain language," the ICPC does not apply to placements with natural parents). We also note that, like *Fellows*, our decision in *Benway* did not apply the supremacy-of-text principle. *See Benway*, 745 So.

4

"written notice of the intention to send, bring, or place the child in the receiving state." *Id.* § 409.401, art. III(b). The prospective receiving state then may demand "such supporting or additional information as it may deem necessary under the circumstances to carry out the purpose and policy of" the ICPC. *Id.* § 409.401, art. III(c). The interstate placement may occur only after the prospective receiving state has consented: "The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency . . . that the proposed placement does not appear to be contrary to the interests of the child." *Id.* § 409.401, art. III(d).

But what happens when an ICPC-compliant interstate placement has occurred and the receiving state later purports to

---

2d at 438 ("The purpose of the ICPC is . . . ."). Instead, *Benway* rejected the text-focused approach as a "strict interpretation of the ICPC," *id.* at 438 n.4 (disapproving *McComb v. Wambaugh*, 934 F.2d 474, 482 (3d Cir. 1991), and *Nance v. Ark. Dep't of Hum. Servs.*, 870 S.W.2d 721 (Ark. 1994)), and it relied on a law review article that advocated a purposivist interpretation, *see id.* at 439 ("Ms. Butler wrote that the ICPC should be interpreted to include the placement of a child with his natural parents to 'best ensure that a child is placed in a suitable environment, which, after all, is the main purpose of the Compact.'" (quoting Kimberly M. Butler, *Child Welfare—Outside the Interstate Compact on the Placement of Children—Placement of a Child with a Natural Parent*, 37 Vill. L. Rev. 896, 909 (1991)). Moreover, the dictum in the Oregon decision on which *Benway* heavily relied has now been repudiated by the court that wrote it. *See Matter of J.B.*, 489 P.3d 598, 600, 607 n.6 (Or. Ct. App. 2021) (holding that the relevant passage in *State ex rel. Juvenile Department of Clackamas County v. Smith*, 811 P.2d 145, 147 n.4 (Or. Ct. App. 1991), was non-binding dictum that "misstated the law," and holding that the ICPC's "requirements are not mandatory when a child is placed with a parent in another state"); *see also Benway*, 745 So. 2d at 438–39 (relying on the now-repudiated dictum in *Smith*). We encourage our court to reexamine *Benway* and its progeny in an appropriate future case.

5

revoke its consent? Under Regulation 11, promulgated by the Association of Administrators of the ICPC ("AAICPC"), the answer is clear: "the receiving state has sole discretion in determining whether or not to require return of a child to the sending state," so long as the receiving state has first notified the sending state of any unmet needs and "the child's needs continue to be unmet after the notification." AAICPC Reg. 11, § 9(d), (e).

There's just one problem: Florida has not (yet) enacted Regulation 11, and the ICPC text that Florida has (thus far) enacted doesn't explicitly authorize the receiving state unilaterally to require the child's return to the sending state. *See D.R. v. J.R.*, 203 So. 3d 952, 955–56 (Fla. 5th DCA 2016) (agreeing with the Fourth District that an AAICPC regulation has no legal effect unless "adopted into law by the State of Florida" (quoting *B.G. v. Dep't of Child. & Fams.*, 189 So. 3d 305, 306 (Fla. 4th DCA 2016))). Any such unilateral authority of the receiving state, therefore, depends on inference from the statutory text.

To be sure, just as *Fellows* did, one could infer that the receiving state has unilateral authority to order the child's return. Florida's enactment of the ICPC directs that "[t]he child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state" have consented. § 409.401, art. III(d), Fla. Stat. One could read this provision as being triggered any time the child crosses state lines into the receiving state, even under circumstances such as in our case and in *Fellows*. After all, once the receiving state has revoked its consent and the child has returned to Florida, any reversal of that return will involve Florida sending or bringing (or causing to be sent or brought) the child back into the receiving state once again. *See id.*

But other ICPC provisions may suggest a different answer. Article V(a) provides that "the sending agency shall retain jurisdiction over the child sufficient to determine *all matters* in relation to the custody, supervision, care, treatment and disposition of the child," including "the power *to effect or cause the return* of the child." *Id.* § 409.401, art. V(a) (emphases added). The article goes on to stipulate that "[n]othing contained herein shall defeat a claim of jurisdiction by a receiving state sufficient to deal

6

with an act of delinquency or crime committed therein." *Id.* Taken together, these provisions might imply that the sending agency's return authority is exclusive. In other words, these provisions can be read to confer on the sending (Florida) agency the lion's share of jurisdiction over the child—including an exclusive, unilateral authority to "effect or cause the return of the child" to Florida— and to confer on the receiving state only a narrow, carve-out slice of jurisdiction over the child "sufficient to deal with an act of delinquency or crime committed therein." *Id.* Under this reading, the receiving state has exclusive authority whether to consent to an interstate placement, but once that consent has been given and the ICPC-compliant interstate placement has occurred, the *sending* state has exclusive authority whether to return the child.

There's also a third possibility: Florida's current enactment of the ICPC simply might not address what happens when the receiving state changes its mind following an ICPC-compliant interstate placement. Such statutory "gaps" (to use a loaded and, perhaps, unfair term) are best left alone by the courts. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012) ("The principle that a matter not covered is not covered is so obvious that it seems absurd to recite it."); *id.* at 94 ("The absent provision cannot be supplied by the courts."). And lest we be tempted to assert "an inherent judicial power to write the law" rather than read it, *id.* at 95, we would do well to remember that we aren't the only game in town. Just as statutes can fill gaps in contracts, *see Fla. Farm Bureau Gen. Ins. Co. v. Williams*, 391 So. 3d 497, 503 (Fla. 5th DCA 2024), so too can contracts fill "gaps" in statutes. It's entirely reasonable to think that, by declining to explicitly address situations like these, Florida's enactment of the ICPC might leave to the sending and receiving states themselves to decide in the first instance which state has return authority, and whether (and how) that authority is shared. There's no reason that the states could not provide such terms, whether in a memorandum of understanding or other form of agreement. *See* § 409.404, Fla. Stat. (authorizing interstate agreements pursuant to Article V(b) of the ICPC). Under this reading of the ICPC, *Fellows* erred by supplying an answer that the ICPC's silence allows the states themselves to supply.

To be clear, we aren't saying that *Fellows* is plainly wrong. We're simply saying that *Fellows* failed to meaningfully engage the statutory text, the text could suggest a different outcome, and it would be worth our court's time to revisit *Fellows* in an appropriate case. Because this case comes to us as a petition for an extraordinary writ, it isn't the right vehicle for that reexamination. *See Kaklamanos*, 843 So. 2d at 889; *Campbell*, 295 So. 3d at 870. But in the future, our court surely will encounter other cases that present the question unencumbered by the heightened standard of review that accompanies petitions for writs of certiorari.

This recurring issue—receiving states seeking to unilaterally reverse an already-consummated ICPC-compliant placement, notwithstanding Florida's judgment (at least initially shared by the receiving state) that the child should be placed in the receiving state—surely is one "of exceptional importance." Fla. R. App. P. 9.331(d)(1). Indeed, few matters are more important, as this case itself shows. In its petition on behalf of a troubled nine-year-old boy whom state authorities have now ping-ponged into and out of his mother's home across state lines, the GAL represents:

> The court's order irreparably harms B.G. by inflicting emotional and mental harm on this already fragile child and by prolonging, if not eliminating, his path to full reunification with his mother without state supervision. The court abdicated its duty to protect B.G.'s interests and rights under chapter 39, not to mention the mother's constitutional rights,[3] to a lone Kentucky case worker—who had been to the

---

[3] The mother is not a party to the Petition, and the GAL cannot bring a constitutional claim on her behalf. *See Sieniarecki v. State*, 756 So. 2d 68, 76 (Fla. 2000) (recognizing that "constitutional rights are personal in nature and generally may not be asserted vicariously"); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) (stating that "constitutional rights are personal and may not be asserted vicariously"). Therefore, no constitutional claim is before us.

home once in three months and never even met B.G.

The GAL's petition goes on to describe the mother's efforts to address B.G.'s concerning behavioral issues, as well as her ongoing attempt to locate the services that Kentucky is either unable or unwilling to provide.

In its order, the trial court noted that the mother, GAL volunteer, and licensed family therapist "all testified that they believed that [B.G.] should be placed in a higher level of care, but that it would be in [B.G.'s] best interests to be placed with the mother, as opposed to foster care in Florida, while the mother secures a higher level of care type placement in the State of Kentucky." In line with that testimony, the court found that the enumerated statutory factors "appear facially favorable to ordering placement of the child with the mother." *See* § 39.522(6), Fla. Stat. (listing placement factors). The court nonetheless ordered that B.G. remain in Florida foster care based substantially on its conclusion—consistent with *Fellows*—that Kentucky had unilateral authority under the ICPC to order the child's return to Florida, and the child's lack of needed services in Kentucky outweighed all other factors. In so ruling, the court noted its "concern[ ] with the level of the State of Kentucky's efforts to provide supervision for the child." But in the end, the court concluded that B.G. needed services that Kentucky would not provide and the ICPC prevented the court from ordering the commonsense solution that the mother, the GAL volunteer, and the therapist had suggested.

In cases of this magnitude involving the placement of children, we owe it to them—and ourselves—to ensure that our reading of the law is the correct one. Unless and until Florida enacts Regulation 11 or the new ICPC becomes effective, *see* § 409.408, Fla. Stat., we call on our court to revisit *Fellows* in an appropriate future case.

PETITION DENIED.

SOUD, J., concurs.
EISNAUGLE , J., concurs in result only with opinion.

9

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____

EISNAUGLE, J., concurring in result only with opinion.

I agree that our decision in *Department of Children & Families v. Fellows*, 895 So. 2d 1181, 1183 (Fla. 5th DCA 2005) is binding in this case. I also agree that our analysis in *Fellows* is deficient because we failed to engage the actual text of the statute. *See Mercury Indem. Co. of Am. v. Cent. Fla. Med. & Chiropractic Ctr., Inc.*, 380 So. 3d 477, 479 (Fla. 5th DCA 2023) ("When interpreting a statute, it is always wise to begin with the text itself."). However, I would leave the majority's additional analysis concerning the various possible interpretations of the statute for a future proceeding.

Similarly, given the arguments presented to us in the petition, I find no occasion to discuss our decision in *Department of Children & Families v. Benway*, 745 So. 2d 437, 439 (Fla. 5th DCA 1999) or whether Article III of the Interstate Compact on the Placement of Children applies to placements with natural parents.

11